[No. B023193. Second Dist., Div. Seven, July 18, 1989.]

LARRY WOLLERSHEIM, Plaintiff and Respondent, v. CHURCH OF SCIENTOLOGY OF CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, Eric M. Lieberman, Terry Gross, Lenske, Lenske & Heller, Lawrence E. Heller and Michael Lee Hertzberg for Defendant and Appellant.

Boothby, Ziprick & Yingst, William F. Ziprick, Lee Boothby and James M. Parker as Amici Curiae on behalf of Defendant and Appellant.

Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg and Charles B. O'Reilly for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—This appeal arises after a jury awarded $30 million in compensatory and punitive damages to a former member of the Church of Scientology of California (the Church or Scientology). The complaint al-

leged appellant intentionally and negligently inflicted severe emotional injury on respondent through certain practices, including "auditing," "disconnect," and "fair game." Since the trial court granted summary adjudication that Scientology is a religion and "auditing" is a religious practice, the trial proceeded under the assumption it was. We conclude there was substantial evidence to support a factual finding the "auditing," as well as other practices in this case, were conducted in a coercive environment. Thus, none of them qualified as "*voluntary* religious practices" entitled to constitutional protection under the First Amendment religious freedom guaranties. At the same time, we conclude both the compensatory and punitive damages the jury awarded in this case are excessive. Consequently, we modify the judgment to reduce both of these damage awards.

## FACTS AND PROCEEDINGS BELOW

Construing the facts most favorably to the judgment, as we must, respondent Larry Wollersheim was an incipient manic-depressive for most of his life. Appellant Scientology and its leaders were aware of Wollersheim's susceptibility to this mental disorder: What appellant did to him during and after his years in Scientology aggravated Wollersheim's mental condition, driving him into deep depressive episodes and causing him severe mental anguish. Furthermore, Scientology engaged in a practice of retribution and threatened retribution—often called "fair game"—against members who left or otherwise posed a threat to the organization. This practice coerced Wollersheim into continued participation in the other practices of Scientology which were harming him emotionally.

Wollersheim first became acquainted with Scientology in early 1969 when he attended a lecture at the "Church of Scientology of San Francisco." During the next few months he completed some basic courses at the San Francisco institution. He then returned to his home state of Wisconsin and did not resume his Scientology training for almost two years.

When Wollersheim did start again it was at the appellant, Church of Scientology of California, headquartered in Los Angeles. From 1972 through 1979 Wollersheim underwent "auditing" at both the basic and advanced levels. In 1973 he worked several months as a staff member at the Church of Scientology Celebrity Center located in Los Angeles. In 1974, despite his repeated objections, Wollersheim was persuaded to participate in auditing aboard a ship maintained by Scientology. While on the ship, Wollersheim was forced to undergo a strenuous regime which began around 6 a.m. and continued until 1 a.m. the next morning. Further, Wollersheim and others were forced to sleep nine deep in the ship's hold. During his six weeks under these conditions, Wollersheim lost fifteen pounds.

Wollersheim attempted to escape from the ship because he felt he "was dying and losing [his] mind." His escape was thwarted by Scientology members who seized Wollersheim and held him captive until he agreed to remain and continue with the auditing and other religious practices taking place on the vessel. One of the psychiatric witnesses testified Wollersheim's experience on the ship was one of five cataclysmic events underlying the diagnosis of his mental illness and its cause.

At another stage Scientology auditors convinced him to "disconnect" from his wife and his parents and other family members because they had expressed concerns about Scientology and Wollersheim's continued membership. "Disconnect" meant he was no longer to have any contact with his family.

There also was evidence of a practice called "freeloader debt." "Freeloader debt" was accumulated when a staff member received Church courses, training or auditing at a reduced rate. If the member later chose to leave, he or she was presented with a bill for the difference between the full price normally charged to the public and the price originally charged to the member. Appellant maintained a "freeloader debt" account for Wollersheim.

During his years with Scientology Wollersheim also started and operated several businesses. The most successful was the last, a service which took and printed photographic portraits. Most of the employees and many of the customers of this business were Scientologists.

By 1979, Wollersheim's mental condition worsened to the point he actively contemplated suicide. Wollersheim began experiencing personality changes and pain. When the Church learned of Wollersheim's condition, Wollersheim was sent to the Flag Land Base for "repair."

During auditing at Flag Land Base, Wollersheim's mental state deteriorated further. He fled the base and wandered the streets. A guardian later arranged to meet Wollersheim. At that meeting, the guardian told Wollersheim he was prohibited from ever speaking of his problems with a priest, a doctor or a psychiatrist.

Ultimately Wollersheim became so convinced auditing was causing him psychiatric problems he was willing to risk becoming a target of "freeloader debt" and "fair game." Evidence was introduced that, at least during the time relevant to Wollersheim's case, "fair game" was a practice of retribution Scientology threatened to inflict on "suppressives," which included people who left the organization or anyone who could pose a threat to the

organization. Once someone was identified as a "suppressive," all Scientologists were authorized to do anything to "neutralize" that individual—economically, politically, and psychologically.

After Wollersheim left the organization Scientology leaders initiated a "fair game" campaign which among other things was calculated to destroy Wollersheim's photography enterprise. They instructed some Scientology members to leave Wollersheim's employ, told others not to place any new orders with him and to renege on bills they owed on previous purchases from the business. This strategy shortly drove Wollersheim's photography business into bankruptcy. His mental condition deteriorated further and he ended up under psychiatric care.

Wollersheim thereafter filed this lawsuit alleging fraud, intentional infliction of emotional injury, and negligent infliction of emotional injury. At the law-and-motion stage, a trial court granted summary adjudication on two vital questions. It ruled Scientology is a religion and "auditing" is a religious practice of that religion.

During trial, Wollersheim's experts testified Scientology's "auditing" and "disconnect" practices constituted "brain-washing" and "thought reform" akin to what the Chinese and North Koreans practiced on American prisoners of war. They also testified this "brain-washing" aggravated Wollersheim's bipolar manic-depressive personality and caused his mental illness. Other testimony established Scientology is a hierarchical organization which exhibits near paranoid attitudes toward certain institutions and individuals—in particular, the government, mental health professions, disaffected members and others who criticize the organization or its leadership. Evidence also was introduced detailing Scientology's retribution policy, sometimes called "fair game."

After the evidence was heard, the trial judge dismissed the fraud count but allowed both the intentional and negligent infliction of emotional injury counts to go to the jury. The jury, in turn, returned a general verdict in favor of plaintiff on both counts. It awarded $5 million in compensatory damages and $25 million in punitive damages. The motion for new trial was denied and appellants filed a timely appeal.

## DISCUSSION

Appellant raises a broad spectrum of issues all the way from a technical statute of limitations defense to a fundamental constitutional challenge to this entire species of claims against Scientology. If the narrower grounds of appeal had merit and disposed of the case we could avoid confronting the

difficult constitutional questions. But since they do not we must consider Scientology's religious freedom claims.

### I. THERE IS SUBSTANTIAL EVIDENCE TO SUPPORT WOLLERSHEIM'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

■ The cause of action for intentional infliction of emotional injury formed the centerpiece of the case which went to the jury. This claim actually cumulates four courses of conduct which together allegedly inflicted severe emotional damage on the psychologically weak Wollersheim. These courses of conduct are: (1) subjecting Wollersheim to forms of "auditing" which aggravated his predisposition to bipolar mania-depression; (2) psychologically coercing him to "disconnect" from his family; (3) "disclosing personal information" Wollersheim revealed during auditing under a mantle of confidentiality; and, (4) conducting a retributive campaign "fair game" against Wollersheim and particularly against his business enterprise.

■ The tort of intentional infliction of emotional distress was created to punish conduct " 'exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress.' " (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58].) A prima facie case requires: (1) outrageous conduct by the defendant; (2) an intention by the defendant to cause, or the reckless disregard of the probability of causing, emotional distress; (3) severe emotional distress; and (4) an actual and proximate causation of the emotional distress. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 300 [253 Cal.Rptr. 97, 763 P.2d 948].)

"Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." (*Agarwal* v. *Johnson, supra,* 25 Cal.3d at p. 946.)

■ There is substantial evidence to support the jury's finding on this theory. First, the Church's conduct was manifestly outrageous. Using its position as his religious leader, the Church and its agents coerced Wollersheim into continuing "auditing" although his sanity was repeatedly threatened by this practice. (See pp. 892-894, *post.*) Wollersheim was compelled to abandon his wife and his family through the policy of disconnect. When his mental illness reached such a level he actively planned his suicide, he was

forbidden to seek professional help. Finally, when Wollersheim was able to leave the Church, it subjected him to financial ruin through its policy of "fair game."

Any one of these acts exceeds the "bounds usually tolerated by a decent society," so as to constitute outrageous conduct. In aggregate, there can be no question this conduct warrants liability *unless it is privileged as constitutionally protected religious activity*. (See pp. 883-886, *post*.)

Second, the Church's actions, if not wholly calculated to cause emotional distress, unquestionably constituted reckless disregard for the likelihood of causing emotional distress. The policy of fair game, by its nature, was intended to punish the person who dared to leave the Church. Here, the Church actively encouraged its members to destroy Wollersheim's business.

Further, by physically restraining Wollersheim from leaving the Church's ship, and subjecting him to further auditing despite his protests, the Church ignored Wollersheim's emotional state and callously compelled him to continue in a practice known to cause him emotional distress.

Third, Wollersheim suffered severe emotional distress. Indeed, his distress was such that he actively considered suicide and suffered such psychiatric injury as to require prolonged professional therapy. (See *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] [severe emotional distress "may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry"].)

Finally, there is substantial evidence the Church's conduct proximately caused the severe emotional distress. Wollersheim's bankruptcy and resulting mental distress was the direct result of the Church's declaration that he was fair game. Additionally, according to the psychiatric testimony auditing and disconnect substantially aggravated his mental illness and triggered several severe depressive episodes.

In sum, there is ample evidence to support the jury's verdict on Wollersheim's claim for intentional infliction of emotional distress. This, however, does not conclude our inquiry. As we discuss below, Wollersheim's action may nonetheless be barred if we conclude the Church's conduct was protected under the free exercise clause of the First Amendment.

## II. CONSTITUTIONAL RELIGIOUS FREEDOM GUARANTIES DO NOT IMMUNIZE SCIENTOLOGY FROM LIABILITY FOR ANY OF THE ACTIONS ON WHICH WOLLERSHEIM'S INTENTIONAL INFLICTION OF EMOTIONAL INJURY CAUSE OF ACTION IS BASED

Scientology asserts all four courses of conduct comprising the intentional infliction claim are forms of religious expression protected by the freedom of religion clauses of the United States and California Constitutions. We conclude some would not be protected religious activity even if Wollersheim freely participated. We further conclude none of these courses of conduct qualified as protected religious activity in Wollersheim's case. Here they occurred in a coercive atmosphere appellant created through threats of retribution against those who would leave the organization. To explain our conclusions it is necessary to examine the parameters and rationale of the religious freedom provisions in some depth.

### A. *The Basic Principles of the "Free Exercise" Clause*

Religious freedom is guaranteed American citizens in just 16 words in the First Amendment. "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise* thereof; . . . " (U.S. Const., Amend. I, italics added.)[1]

When it was adopted, the First Amendment only applied to the federal government, not the states. (U.S. Const., 1st Amend. ["*Congress* shall make no law . . ."], italics added; see *Permoli* v. *First Municipality* (1845) 44 U.S. 589, 609 [11 L.Ed. 739, 748].) However, following ratification of the Fourteenth Amendment, the First Amendment protections became enforceable against the states via the Fourteenth Amendment's due process clause. (*California* v. *Grace Brethren Church* (1982) 457 U.S. 393, 396, fn. 1 [73 L.Ed.2d 93, 99, 102 S.Ct. 2498]; *Everson* v. *Board of Education* (1947) 330 U.S. 1, 8 [91 L.Ed. 711, 719, 67 S.Ct. 504, 168 A.L.R. 1392].)

"[T]he application of tort law to activities of a church or its adherents in their furtherance of their religious belief is an exercise of state power. When the imposition of liability would result in the abridgement of the right to free exercise of religious beliefs, recovery in tort is barred." (*Paul* v. *Watchtower Bible & Tract Soc. of New York* (9th Cir. 1987) 819 F.2d 875, 880; accord *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1114 [252 Cal.Rptr. 122, 762 P.2d 46] ["judicial sanctioning of tort recovery consti-

---

[1] All discussion in this opinion as to the freedom of religion provisions of the United States Constitution applies also to appellant's claims under article I, section 4 of the California Constitution which guarantees "[f]ree exercise and enjoyment of religion without discrimination or preference."

tutes state action sufficient to invoke the same constitutional protections applicable to statutes and other legislative actions"]; see *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 277 [11 L.Ed.2d 686, 705-705, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

As can be seen, the First Amendment creates two very different protections. The "establishment clause"—actually an *"anti*-establishment clause"—guarantees us the government will not use its resources to impose religion on us. The "free exercise clause," on the other hand, guarantees us government will not prevent its citizens from pursuing any religion we choose.

The "establishment clause" comes into play when a government policy has the effect of promoting religion—as by financing religious schools or requiring religious prayers in public schools, and the like. These policies violate the establishment clause unless they survive a three-part test. They must have a secular purpose. Their primary effects must be ones which neither advance nor inhibit religion. And they must avoid any excessive entanglements with religion. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]; see also *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 773 [37 L.Ed.2d 948, 963, 93 S.Ct. 2955]; *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 222 [10 L.Ed.2d 844, 858, 83 S.Ct. 1560].) The "free exercise clause," in contrast to the "establishment clause," was adopted without debate or comment when the First Congress deliberated the Bill of Rights. (Malbin, Religion and Politics: The Intentions of the Authors of the First Amendment (1976).) Thus the courts have turned to other writings by those responsible for the Bill of Rights, especially James Madison and Thomas Jefferson, to divine the meaning of "free exercise of religion."

◼ The subsequent cases interpreting these four words make it clear that while the free exercise clause provides absolute protection for a person's religious *beliefs,* it provides only limited protection for the *expression* of those beliefs and especially *actions* based on those beliefs. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352].) Freedom of belief is absolutely guaranteed; freedom of action is not. Thus government cannot constitutionally burden any belief no matter how outlandish or dangerous. But in certain circumstances it can burden an expression of belief which adversely affects significant societal interests. To do so, the burden on belief must satisfy a four-part test. First, the government must be seeking to further an important—and some opinions suggest a compelling—state interest. Second, the burden on expression must be essential to further this state interest. Third, the type and level of burden imposed must be the minimum required to achieve the

state interest. Finally, the measure imposing the burden must apply to everyone, not merely to those who have a religious belief; that is, it may not discriminate against religion.

A straightforward exposition of three prongs of this test is found in *United States* v. *Lee* (1982) 455 U.S. 252, 257-258 [71 L.Ed.2d 127, 132, 102 S.Ct. 1051] where the Supreme Court held: "The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest. (Citations omitted.)" All four are mentioned in *Braunfeld* v. *Brown* (1961) 366 U.S. 599, 607 [6 L.Ed.2d 563, 568-569, 81 S.Ct. 1144]: "If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid . . . . But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden." (See also *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 717-718 [67 L.Ed.2d 624, 633-634, 101 S.Ct. 1425]; *Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 220 [32 L.Ed.2d 15, 28, 92 S.Ct. 1526]; *Gillette* v. *United States* (1971) 401 U.S. 437, 462 [28 L.Ed.2d 168, 187-188, 91 S.Ct. 828]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 402-403 [10 L.Ed.2d 965, 969-970, 83 S.Ct. 1790]; *Cantwell* v. *Connecticut, supra,* 310 U.S. at pp. 304-305 [84 L.Ed.2d at pp. 1218-1219].)

A review of the Supreme Court's "free exercise" rulings also makes it apparent the four critical factors are interrelated. Roughly speaking, the heavier the burden the government imposes on the expression of belief and the more significant the particular form of expression which is burdened, the more important the state interest must be. Or to put it the other way around, the more important the interest the state seeks to further, the heavier the burden it can constitutionally impose on the more important forms of expressing religious belief. Thus, only the most compelling of state interests—such as the preservation of life or of the state itself—will justify an outright ban on an important method of expressing a religious belief. (See, e.g., *Reynolds* v. *United States* (1878) 98 U.S. 145, 164 [25 L.Ed. 244, 249] [polygamy can be outlawed even though a central religious tenet of the Mormon religion because it "has always been odious among the northern and western nations of Europe, . . . and from the earliest history of England has been treated as an *offence against society*." (Italics added.)]; *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 170 [88 L.Ed. 645, 654-655, 64 S.Ct. 438] [parents can be prohibited from allowing their children to distribute religious literature even though this is a religious duty required in order to avoid "everlasting destruction at Armageddon" where necessary to protect

the health and safety of youth]; *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 26 [49 L.Ed. 643, 649-650, 25 S.Ct. 358] [adults and children can be compelled to be vaccinated for communicable diseases even though their religious beliefs oppose vaccination because as was observed in *Prince* v. *Massachusetts, supra,* 321 U.S. at pp. 166-167 (88 L.Ed. at p. 653), "[T]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"].)

But a less significant state interest may be enough where the burden is less direct or the form of expression less central to the exercise of the particular religion. (See, e.g., *Goldman* v. *Weinberger* (1986) 475 U.S. 503, 509-510 [89 L.Ed.2d 478, 485-486, 106 S.Ct. 1310] where the military's apparently rather marginal interest in absolutely uniform attire was enough to justify an outright ban against a Jewish officer's apparently rather marginal form of religious expression in wearing a yarmulke [a religious cap] indoors.) In *Bowen* v. *Roy* (1986) 476 U.S. 693 [90 L.Ed.2d 735, 106 S.Ct. 2147], disapproved on other grounds in *Hobbie* v. *Unemployment Appeals Commission* (1987) 480 U.S. 136, 141 [94 L.Ed.2d 190, 197-198, 107 S.Ct. 1046], the U.S. Supreme Court found the federal government's interest in administrative convenience in preventing fraud in a benefit program was enough to justify the minimal burden of denying benefits to those who because of religious beliefs refuse to obtain and reveal social security numbers. (*Braunfeld* v. *Brown, supra,* 366 U.S. 599, 605 [6 L.Ed.2d 563, 567] [governmental interest in prohibiting economic activity on Sundays is enough to justify imposing the burden of an economic loss on those orthodox Jews who choose to exercise their religious belief that they not work on Saturdays and thus lose two rather than only one day's opportunity to earn money. "[T]he case before us . . . does not make *unlawful* any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs *more expensive*"], italics added.)

We now apply the above principles to the four courses of conduct alleged in Wollersheim's intentional infliction of emotional injury cause of action. ▪ To be entitled to constitutional protection under the freedom of religion clauses any course of conduct must satisfy three requirements. First, the system of thought to which the course of conduct relates must qualify as a "religion," not a philosophy or science or personal preference. Thus, it is unlikely a psychiatrist could successfully shield himself from malpractice by asserting he was merely practicing the "religion" of psychotherapy and following the "religious" teachings of Freud and Jung. Second, the course of conduct must qualify as an expression of that religion and not just an activity that religious people happen to be doing. Thus, driving a

Sunday-school bus does not constitute a religious practice merely because the bus is owned by a religion, the driver is an ordained minister of the religion, and the bus is taking church members to a religious ceremony. (See *Malloy* v. *Fong* (1951) 37 Cal.2d 356, 373 [232 P.2d 241] [religious organization held liable for employee's negligent driving]; *Meyers* v. *S.W. Reg. Con. Ass'n. of Seventh Day Adv.* (1956) 230 La. 310 [88 So.2d 381, 386] [First Amendment does not bar minister's workers' compensation action against church for injuries arising from auto accident which occurred when minister was traveling to church conference].) And, third, the religious expression must not inflict so much harm that there is a compelling state interest in discouraging the practice which outweighs the values served by freedom of religion. Thus, the fact polygamy was a central practice of the Mormon religion was not enough to qualify it for constitutional protection from state governments which desired to ban this practice.

This means we must first ask three questions as to each of the four courses of conduct Wollersheim alleged against Scientology. (1) Does Scientology qualify as a religion? (2) If so, is the course of conduct at issue an expression of the religion of Scientology? (3) If it is, does the public nevertheless have a compelling secular interest in discouraging this course of conduct even though it qualifies as a religious expression of the Scientology religion? After answering these three questions, however, the special circumstances of this case require us to ask a fourth. Did Wollersheim participate in this course of conduct voluntarily or did Scientology coerce his continued participation through the threat of serious sanctions if he left the religion?

The threshold question for all four courses of conduct is whether Scientology qualifies as a religion. As will be recalled, at the law-and-motion stage, a judge granted summary adjudication on this issue. That court ruled Scientology indeed was a religion. And at the trial stage, another judge reinforced this ruling by submitting the case to the jury with an instruction that Scientology is a religion.

As a result of the law-and-motion judge's decision on this question, evidence was not introduced at trial on the specific issue of whether Scientology is a religion. Given that vacuum of information, it would be presumptuous of this court to attempt a definitive decision on this vital question. We note other appellate courts have observed this remains a very live and interesting question. (See *Founding Church of Scientology* v. *United States* (D.C. Cir. 1969) 409 F.2d 1146, 1160-1161 [133 App.D.C. 229, 13 A.L.R.Fed. 721]; *Founding Church of Scientology* v. *Webster* (D.C. Cir. 1986) 802 F.2d 1448, 1451 [256 App.D.C. 54] ["whether Scientology is a religious organization, a for-profit private enterprise, or something far more

extraordinary [is] an intriguing question that this suit does not call upon us to examine . . . ."].) However, we have no occasion to go beyond a review of the summary adjudication decision the trial court reached at the law-and-motion stage. In reviewing this decision, we find that on the evidence before the court the judge properly ruled Scientology qualifies as a religion within the meaning of the freedom of religion clauses of the United States and California Constitutions.

This brings us to the remaining three questions as to each of the four courses of conduct: Is the conduct a "religious practice"? If so, is there a compelling secular interest in requiring compensation for the injuries attributable to that practice? If the constitutional immunity is not overridden by a compelling state interest in the ordinary situation, is it nevertheless stripped away here because the religion coerced the injured member into continuing his participation in the practice?

### B. *Even Assuming the Retributive Conduct Sometimes Called "Fair Game" Is a Core Practice of Scientology It Does Not Qualify for Constitutional Protection*

As we have seen, not every religious expression is worthy of constitutional protection. To illustrate, centuries ago the inquisition was one of the core religious practices of the Christian religion in Europe. This religious practice involved torture and execution of heretics and miscreants. (See generally Peters, Inquisition (1988); Lea, The Inquisition of the Middle Ages (1961).) Yet should any church seek to resurrect the inquisition in this country under a claim of free religious expression, can anyone doubt the constitutional authority of an American government to halt the torture and executions? And can anyone seriously question the right of the victims of our hypothetical modern day inquisition to sue their tormentors for any injuries—physical or psychological—they sustained?

We do not mean to suggest Scientology's retributive program as described in the evidence of this case represented a full-scale modern day "inquisition." Nevertheless, there are some parallels in purpose and effect. "Fair game" like the "inquisition" targeted "heretics" who threatened the dogma and institutional integrity of the mother church. Once "proven" to be a "heretic," an individual was to be neutralized. In medieval times neutralization often meant incarceration, torture, and death. (Peters, Inquisition, *supra,* pp. 57, 65-67, 87, 92-94, 98, 117-118, 133-134; Lea, The Inquisition of the Middle Ages, *supra,* pp. 181, 193-202, 232-236, 250-264, 828-829.) As described in the evidence at this trial the "fair game" policy neutralized the "heretic" by stripping this person of his or her economic, political and psychological power. (See, e.g., *Allard* v. *Church of Scientology*

(1976) 58 Cal.App.3d 439, 444 [129 Cal.Rptr. 797] [former church member falsely accused by Church of grand theft as part of "fair game" policy, subjecting member to arrest and imprisonment].)

In the instant case, at least, the prime focus of the "fair game" campaign was against the "heretic" Wollersheim's economic interests. Substantial evidence supports the inference Scientology set out to ruin Wollersheim's photography enterprise. Scientologists who worked in the business were instructed to resign immediately. Scientologists who were customers were told to stop placing orders with the business. Most significantly, those who owed money for previous orders were instructed to renege on their payments. Although these payments actually were going to a factor not Wollersheim, the effect was to deprive Wollersheim of the line of credit he needed to continue in business.

Appellant argues these "fair game" practices are protected religious expression. They cite to a recent Ninth Circuit case upholding the constitutional right of the Jehovah's Witness Church and its members to "shun" heretics from that religion even though the heretics suffer emotional injury as a result. (*Paul* v. *Watchtower Bible & Tract Soc. of New York, supra,* 819 F.2d 875.) In this case a former Jehovah's Witness sued the church and certain church leaders for injuries she claimed to have suffered when the church ordered all other church members to "shun" her. In the Jehovah Witness religion, "shunning" means church members are prohibited from having any contact whatsoever with the former member. They are not to greet them or conduct any business with them or socialize with them in any manner. Thus, there was a clear connection between the religious practice of "shunning" and Ms. Paul's emotional injuries. Nonetheless, the trial court dismissed her case. The Ninth Circuit affirmed in an opinion which expressly held "shunning" is a constitutionally protected religious practice. "[T]he defendants, . . . possess an affirmative defense of privilege—a defense that permits them to engage in the practice of shunning pursuant to their religious beliefs without incurring tort liability." (*Id.* at p. 879.)

We first note another appellate court has taken the opposite view on the constitutionality of "shunning." (*Bear* v. *Reformed Mennonite Church* (1975) 462 Pa. 330 [341 A.2d 105].) In this case the Pennsylvania Supreme Court confronted a situation similar to *Paul* v. *Watchtower Bible & Tract Soc. of New York.* The plaintiff was a former member of the Mennonite Church. He was excommunicated for criticizing the church. Church leaders ordered that all members must "shun" the plaintiff. As a result, both his business and family collapsed. The appellate court reversed the trial court's dismissal of the action, holding: "In our opinion, the complaint, . . . raises issues that the 'shunning' practice of appellee church and the conduct of the

individuals may be an excessive interference within areas of 'paramount state concern,' i.e., the maintenance of marriage and family relationship, alienation of affection, and the tortious interference with a business relationship, which the courts of this Commonwealth *may* have authority to regulate, even in light of the 'Establishment' and 'Free Exercise' clauses of the First Amendment." (*Bear* v. *Reformed Mennonite Church, supra,* 341 A.2d at p. 107, italics in original.)

We observe the California Supreme Court has cited with apparent approval the viewpoint on "shunning" expressed in *Bear* v. *Mennonite Church, supra,* rather than the one adopted in *Paul* v. *Watchtower Bible & Tract Soc. of New York, supra.* (See *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092, 1114.) But even were *Paul* v. *Watchtower Bible & Tract Soc. of New York* the law of this jurisdiction it would not support a constitutional shield for Scientology's retribution program. In the instant case Scientology went far beyond the social "shunning" of its heretic, Wollersheim. Substantial evidence supports the conclusion Scientology leaders made the deliberate decision to ruin Wollersheim economically and possibly psychologically. Unlike the plaintiff in *Paul* v. *Watchtower Bible & Tract Soc. of New York,* Wollersheim did not suffer his economic harm as an unintended byproduct of his former religionists' practice of refusing to socialize with him any more. Instead he was bankrupted by a campaign his former religionists carefully designed with the specific intent it bankrupt him. Nor was this campaign limited to means which are arguably legal such as refusing to continue working at Wollersheim's business or to purchase his services or products. Instead the campaign featured a concerted practice of refusing to honor legal obligations Scientologists owed Wollersheim for services and products they already had purchased.

If the Biblical commandment to render unto Caesar what is Caesar's and to render unto God what is God's has any meaning in the modern day it is here. Nothing in *Paul* v. *Watchtower Bible & Tract Soc. of New York* or any other case we have been able to locate even implies a religion is entitled to constitutional protection for a campaign deliberately designed to financially ruin anyone—whether a member or nonmember of that religion. Nor have we found any cases suggesting the free exercise clause can justify a refusal to honor financial obligations the state considers binding and legally enforceable. One can only imagine the utter chaos that could overtake our economy if people who owed money to others were entitled to assert a freedom of religion defense to repayment of those debts. It is not unlikely the courts would soon be flooded with debtors who claimed their religion prohibited them from paying money they owed to others.

We are not certain a deliberate campaign to financially ruin a former member or the dishonoring of debts owed that member qualify as "religious

practices" of Scientology. But if they do, we have no problem concluding the state has a compelling secular interest in discouraging these practices. (See pp. 884-886, *supra*.) Accordingly, we hold the freedom of religion guaranties of the United States and California Constitutions do not immunize these practices from civil liability for any injuries they cause to "targets" such as Wollersheim.

C. *"Auditing" Is a Constitutionally Protected Religious Practice Where It Is Conducted in a Noncoercive Environment But Is Not Protected Where Conducted Under a Threat of Economic, Psychological and Political Retribution as It Was Here*

Auditing is a process of one-on-one dialogue between a Scientology "auditor" and a Scientology student. The student ordinarily is connected to a crude lie detector, a so-called "E-Meter." The auditor asks probing questions and notes the student's reactions as registered on the E-Meter.

Through the questions, answers, and E-meter readings, the auditor seeks to identify the student's "n-grams" or "engrams." These "engrams" are negative feelings, attitudes, or incidents that act as blockages preventing people from realizing their full potential and living life to the fullest. Since Scientology holds the view people actually have lived many past lives over millions of years they carry "engrams" accumulated during those past lives as well as some from their present ones. Once the auditor identifies an "engram" the auditor and the student work to surface and eliminate it. The goal is to identify and eliminate all the student's engrams so he or she can achieve the state of "clear." Students can pass through several levels of "auditing" en route to ever higher states of "clear."

Auditing performs a similar function for Scientology as sermons and other forms of mass persuasion do for many religions. In those religions, ministers, priests or other clergy preach to the multitude in order to bring their adherents into line with the religion's principles. Scientology instead emphasizes a one-on-one approach—the "auditing" process—to accomplish the same purpose.

At the law-and-motion stage, the trial court granted summary adjudication that "auditing" is a "religious practice" of Scientology. Once again, our review of the trial court decision reveals that on the basis of the evidence before the court on that occasion, the ruling is correct. Thus for purposes of this appeal we find "auditing" qualifies as a "religious practice" just as Scientology qualifies as a "religion."

▪ Having found for purposes of this appeal that Scientology is a religion and auditing is a religious practice, we must next ask whether the state

has a "compelling interest" in awarding compensation for any harm auditing may cause which outweighs the values served by the religious expression guaranties of the Constitution.

We first note we have already held there was substantial evidence to support a jury finding that what happened during the "auditing" process, along with Scientology's other conduct toward Wollersheim, caused this particular adherent serious emotional injury. We further found substantial evidence Scientology leaders were aware of Wollersheim's psychological weakness and yet continued practices during auditing sessions which caused the kinds of psychological stress that led to his mental breakdown. Thus, there is adequate proof the religious practice of auditing caused real harm in this instance to this individual and that appellant's outrageous conduct caused that harm. Furthermore, there is sufficient evidence to support a conclusion that despite its knowledge auditing was aggravating Wollersheim's serious psychological problems appellants deliberately insisted he not seek help from professional psychotherapists. None of this, however, means auditing represents such a threat of harm to society that the state has a compelling interest in awarding compensation which overcomes the values served by the religious expression guaranties of the Constitution.

To better understand why we conclude *voluntary* auditing may be entitled to immunity from liability for the emotional injuries it causes, consider some analogies. Assume Wollersheim were not a former Scientologist, but a former follower of one of the scores of Christian denominations. Further assume he sued on grounds a preacher's sermons filled him with such feelings of inferiority and guilt his manic-depressive condition was aggravated to the same degree Wollersheim contends auditing aggravated his mental illness in this case. Or assume another Wollersheim sued another church for a similar emotional injury on grounds his mental illness had been triggered by what a cleric told him about his sins during a confession—or series of confessions. It is one of the functions of many religions to "afflict the comfortable"—to deliberately generate deep psychological discomfort as a means of motivating "sinners" to stop "sinning." Whether by "hell fire and damnation" preaching, "speaking in tongues," private chastising, or a host of subtle and not so subtle techniques religion seeks to make us better people.

Many of these techniques are capable of inflicting emotional distress severe enough that it is foreseeable some with psychiatric problems will "crack" or be driven into a deep depression. But the Constitution values the good religion does for the many more than the psychological injury it may inflict on the few. Thus, it cannot tolerate lawsuits which might chill religious practices—such as auditing, "hell fire and damnation" preaching,

confessions, and the like—where the only harm which occurs is emotional injury to the psychologically weak.

There is an element present in the instant case, however, that reduces the religious value of the "auditing" practiced on Wollersheim and increases its harm to the community. This is the element of coercion. Scientology, unlike most other religions or organizations claiming a religious purpose, uses various sanctions and the threat of sanctions to induce continued membership in the Church and observance of its practices. These sanctions include "fair game," "freeloader debt" and even physical restraint. There was nothing in the evidence presented at this trial suggesting new recruits and members undergoing lower-level "auditing" were subject to sanctions if they decided to leave. Nor was there evidence these recruits or "lower level" auditors would be aware any program of sanctions even existed and thus might be intimidated by it. But there was evidence others, like Wollersheim, who rose to higher levels of auditing and especially those, like Wollersheim, who became staff members—the rough equivalent of becoming a neophyte priest or minister—were aware of these sanctions and what awaited them if they chose to "defect." Thus, their continued participation in "auditing" and the other practices of Scientology was not necessarily voluntary.

Wollersheim was familiar with the whole spectrum of sanctions and indeed was the target of some during and after his affiliation with Scientology. He first learned of one of these forms of retribution, "fair game," in 1970. He also knew that, despite the Church's public rejection of the fair game practice, it continued to use fair game against targeted ex-Scientologists throughout the 1970's. Under Scientology's "fair game" policy, someone who threatened Scientology by leaving the church "may be deprived of property or injured by any means by a Scientologist . . . . [The targeted defector] may be tricked, sued or lied to or destroyed."

Wollersheim feared "fair game" would be practiced against him if he refused further auditing and left the Church of Scientology. As described in the previous section, those fears proved to be accurate. Scientology leaders indeed became very upset by his defection and retaliated against his business.

But "fair game" was not the only sanction which Scientology held over Wollersheim's head during his years as an "upper level" auditor and occasional staff member. Scientology also used a tactic called "freeloader debt" as a means of coercing Wollersheim's continued participation in the church and obedience to its practices. "Freeloader debt" was devised by Scientology founder L. Ron Hubbard as a means of punishing members who, inter

alia, chose to leave the Church or refused to disconnect from a suppressive person.

"Freeloader debt" was accumulated when a staff member received Church courses, training or auditing at a reduced rate. The Church maintained separate records which listed the discounts allowed. If the member later chose to leave, he or she was presented with a bill for the difference between the full price normally charged to the public and the price originally charged to the member.[2] A person who stayed in the Church for five years could easily accumulate a "freeloader debt" of between $10,000 and $50,000. Wollersheim was familiar with the "freeloader debt" policy as well as the "fair game" policy. He also knew the Church was recording the courses and auditing sessions he was receiving at the discounted rate. The threat of facing that amount of debt represented a powerful economic sanction acting to coerce continued participation in auditing as the core religious practice of the Church of Scientology.

There also was evidence Wollersheim accepted some of his auditing under threat of *physical* coercion. In 1974, despite his repeated objections, Wollersheim was induced to participate in auditing aboard a ship Scientology maintained as part of its Rehabilitation Project Force. The Church obtained Wollersheim's attendance by using a technique dubbed "bait and badger." As the name suggests, this tactic deployed any number of Church members against a recalcitrant member who was resisting a Church order. They would alternately promise the "bait" of some reward and "badger" him with verbal scare tactics. In the instant case, five Scientologists "baited and badgered" Wollersheim continuously for three weeks before he finally gave in and agreed to attend the Rehabilitation Project Force.

But these verbal threats and psychological pressure tactics were only the beginning of Wollersheim's ordeal. While on the ship, Wollersheim was forced to undergo a strenuous regime which began around 6 a.m. and continued until 1 a.m. the next morning. The regime included mornings of menial and repetitive cleaning of the ship followed by an afternoon of study or coauditing. The evenings were spent working and attending meetings or conferences. Wollersheim and others were forced to sleep in the ship's hole. A total of 30 people were stacked 9 high in this hole without proper ventilation. During his six weeks under these conditions, Wollersheim lost fifteen pounds.

---

[2] During the 1970's a staff member was paid approximately $17 per week for an expected 50 hours of work. In 1973, Wollersheim earned between $10 to $18 per week when he worked at the Celebrity Center as a staff member. This salary was augmented by an occasional $10 bonus.

Ultimately, Wollersheim felt he could bear the regime no longer. He attempted to escape from the ship because as he testified later: "I was dying and losing my mind." But his escape effort was discovered. Several Scientology members seized Wollersheim and held him captive. They released him only when he agreed to remain and continue with the auditing and other "religious practices" taking place on the vessel.

One of the psychiatric witnesses testified that in her opinion Wollersheim's experience on the ship was one of five cataclysmic events underlying her diagnosis of his mental illness and its cause. As the psychiatrist reported, following this incident, Wollersheim felt the Church "broke him." In any event, this episode demonstrated the Church was willing to physically coerce Wollersheim into continuing with his auditing. Moreover they were willing to do so even when it was apparent this practice was causing him serious mental distress and he preferred to cease or at least suspend this particular religious practice. Not only was the particular series of auditing sessions on the ship conducted under threat of physical compulsion, but the demonstrated willingness to use physical coercion infected later auditing sessions. The fact the Church was willing to use physical coercion on this occasion to compel Wollersheim's continued participation in auditing added yet another element to the coercive environment under which he took part in the auditing process.

There was substantial evidence here from which the jury could have concluded Wollersheim was subjecting himself to auditing because of the coercive environment with which Scientology had surrounded him. To leave the Church or to cease auditing he had to run the risk he would become a target of "fair game," face an enormous burden of "freeloader debt," and even confront physical restraint. A religious practice which takes place in the context of this level of coercion has less religious value than one the recipient engages in voluntarily. Even more significantly, it poses a greater threat to society to have coerced religious practices inflicted on its citizens.

There are important analogies to *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092. In *Molko* the California Supreme Court held a religious organization could be held civilly liable for using deception and fraud to *seduce* new recruits *into the church*.[3] In that case the church concealed from new

---

[3] In *Molko*, two plaintiffs brought actions against the Unification Church for, inter alia, fraud and intentional infliction of emotional distress based upon the Unification Church's initial misrepresentations concerning its religious affiliation. The Supreme Court held the First Amendment did not bar the plaintiffs' claims to the extent they were based upon actual coercive conduct by the Unification Church as opposed to merely the threat of divine retribution should the plaintiffs leave.

recruits the fact they were enlisting in the Unification Church. The plaintiffs argued the Unification Church psychologically and physically coerced them into accepting the Church and, therefore, they were unable to refuse formally joining once the Church's true identity was revealed. (*Id.* at pp. 1108-1109.) The Supreme Court agreed and further concluded there was no constitutional infirmity to bar the action.

"We conclude . . . that although liability for deceptive recruitment practices imposes a marginal burden on the Church's free exercise of religion, the burden is justified by the compelling state interest in protecting individuals and families from the substantial threat to public safety, peace and order posed by the fraudulent induction of unconsenting individuals into an atmosphere of coercive persuasion." (46 Cal.3d at p. 1118.)

Here Scientology used *coercion*—"fair game," "freeloader debt," and in this instance, at least, physical restraint, along with the threat one or more of these sanctions will be deployed—to prevent its members from *leaving* the Church. This coercion is similar to the coercion found in *Molko* and far different from the threat of *divine* retribution our Supreme Court held was nonactionable. (46 Cal.3d at pp. 1120, 1122 ["To the extent the claims are based merely on threats of divine retribution if [the plaintiffs] left the church, they cannot stand"].) Instead, Scientology promised—and in this case delivered—retribution in the here and now.

In *O'Moore* v. *Driscoll* (1933) 135 Cal.App. 770 [28 P.2d 438], cited with approval by the California Supreme Court in *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092, 1114, a Catholic priest sued a Catholic organization and an ordained priest for false imprisonment when the plaintiff was restrained in an asylum run by the Catholic Church to compel his confession to criminal acts. The practice of confessing one's sins is an established religious practice of the Catholic church. But that did not immunize the defendants from liability for harm the plaintiff suffered where the religious practice was imposed on him in a coercive environment. (*Driscoll, supra,* 135 Cal.App. at p. 774.)

In the instant case except for the experience on the ship the coercion was more subtle than physical restraint. Yet the threat of "fair game" and "freeloader debt" and even the possibility of future physical restraint loomed over Wollersheim whenever he contemplated leaving Scientology and terminating auditing or the other practices of that religion.

It is not only the acts of coercion themselves—the sabotage of Wollersheim's business and the episode of captivity on the ship—which are actionable. These acts of coercion and the threat of like acts make the Church's

other harmful conduct actionable as well. No longer is Wollersheim's continued participation in auditing (or for that matter, his compliance with the "disconnect" order) merely his *voluntary* participation in Scientology's religious practices. The evidence establishes Wollersheim was coerced into remaining a member of Scientology and continuing with the auditing process. Constitutional guaranties of religious freedom do not shield such conduct from civil liability. We hold the state has a compelling interest in allowing its citizens to recover for serious emotional injuries they suffer through religious practices they are coerced into accepting. Such conduct is too outrageous to be protected under the Constitution and too unworthy to be privileged under the law of torts.

We further conclude this compelling interest outweighs any burden such liability would impose on the practice of auditing. We concede as the California Supreme Court did in *Molko* that allowing tort liability for this conduct imposes some burden on appellants' free exercise of this religion.[4] Despite the possibility of liability Scientologists can still *believe* it serves a religious purpose to impose and threaten to impose various sanctions on staff members or upper level auditors who might leave the church or cease its core religious practices. But it does place a burden on Scientologists should they act on that belief. Scientology would be subject to possible monetary loss if someone suffers severe psychological harm during auditing where that auditing is conducted under the threat of these sanctions. Likewise, Scientology may lose some staff members and upper level auditors who would not continue in the Church or continue to submit to the core practice of auditing except for their fears of retribution.

Like the Supreme Court in *Molko,* however, we find these burdens "while real, are not substantial" and, moreover, are the minimum required to achieve the state interest. To borrow from the high court's language in *Molko*: "Being subject to liability [for coerced auditing] does not in any way or degree prevent or inhibit [Scientologists] from operating their religious communities, worshipping as they see fit, freely associating with one another, selling or distributing literature, proselytizing on the street, soliciting funds, or generally spreading [L. Ron Hubbard's] message among the population. It certainly does not . . . compel [Scientologists] to perform acts 'at odds with fundamental tenets of their religious beliefs.' [Citation omitted.]" (*Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092, 1117.)

---

[4] "While such liability does not impair the Church's right to believe in recruiting through deception, its very purpose is to discourage the Church from putting such belief into practice by subjecting the church to possible monetary loss for doing so. Further, liability presumably impairs the Church's ability to convert nonbelievers, because some potential members who would have been recruited by deception will choose not to associate with the Church when they are told its true identity." (*Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092, 1117.)

Most significantly, by imposing liability in the instant case we "in no way or degree prevent or inhibit" Scientology from continuing the free exercise of the religious practice of auditing. Returning to the words of the Supreme Court: "At most, it potentially closes one questionable avenue for" coercing certain members to remain in the church and to continue its core practices such as auditing. (46 Cal.3d at p. 1117.)

D. *The "Disconnect" Policy Is Not a Constitutionally Protected Religious Practice in the Circumstances of This Case*

Substantial evidence supports the conclusion Scientology encouraged Wollersheim to "disconnect" from family members, including his wife and parents. Furthermore, substantial evidence supports the conclusion Scientology has a general policy of encouraging members to "disconnect" from non-Scientologists who oppose Scientology or express reservations about its teachings.

The first question is whether the "disconnect" policy qualifies as a "religious practice" of Scientology. The trial court did not grant summary adjudication on this factual issue. Nonetheless, we find the evidence supported the conclusion disconnect is a "religious practice." "Disconnect" is similar in purpose and effect to the "shunning" practiced by Jehovah's Witnesses and Mennonites, among others. It also shares some attributes with the remote monasteries common to many other religions. All of these practices serve to isolate members from those, including family members, who might weaken their adherence to the religion. Courts have held these policies qualify as "religious practices" of other religions. (See, e.g., *Paul* v. *Watchtower Bible & Tract Soc. of New York, supra,* 819 F.2d 875, 879-880; *Rasmussen* v. *Bennett* (Mont. 1987) 741 P.2d 755 [church statements condemning plaintiffs' conduct and calling for shunning were privileged under the First Amendment].) We see no justification for treating Scientology's "disconnect" policy differently and thus hold it is a "religious practice."

We recognize the "shunning" cases have involved claims brought by former church members *whom other family members were ordered to shun.* The instant case, in contrast, involves a cause of action brought by a former church member *ordered to shun the rest of his family* not the other way around. In the circumstances of this case this is a distinction without a difference. Here appellant caused Wollersheim to isolate himself from his parents, wife and other family members even though appellant had reason to know it would inflict serious emotional injury on him. The injury to him and to the family was just as severe as if his family had "shunned" him.

We need not and do not reach the question whether the practice of "disconnect" is constitutionally protected religious activity in ordinary cir-

cumstances. (Contrast *Paul* v. *Watchtower Bible & Tract Soc. of New York, supra,* 819 F.2d 875 [religion cannot be held civilly liable to shunned former member because "shunning" is constitutionally protected] with *Bear* v. *Reformed Mennonite Church, supra,* 341 A.2d 105 [religion may be civilly liable to shunned former member because "shunning" must yield to compelling state interest in promoting family relations].) Whether or not the "disconnect" policy is constitutionally protected when practiced in a voluntary context it is not so protected if practiced in the coercive environment appellant imposed on Wollersheim. The reasons are the same as apply to "auditing." (See pp. 893-898, *ante.*) Substantial evidence supports the finding Scientology created this coercive environment and Wollersheim continued to submit to the practices of the church such as "disconnect" because of that coercion. Furthermore, the evidence in the instant case is sufficient to support a factual finding appellant imposed the "disconnect" policy on Wollersheim with the knowledge he was psychologically susceptible and therefore would suffer severe emotional injury as a result. Accordingly, in the circumstances of this case, the free exercise clause did not immunize appellants from liability for the "disconnect" policy practiced on respondent.

█ E. *Scientology's Improper Disclosure of Information Wollersheim Gave During Confidential Religious Sessions Is Not Religious Expression Immunized From Liability by the Constitution*

There is substantial evidence Wollersheim divulged private information during auditing sessions under an explicit or implicit promise the information would remain confidential. Moreover, there is substantial evidence Scientology leaders and employees shared this confidential information and used it to plan and implement a "fair game" campaign against Wollersheim. Scientology argues there also is substantial evidence in the record supporting its defense that Scientology leaders and employees shared this confidential information only in accordance with normal procedures and for the purpose of gaining the advice and assistance of more experienced Scientologists in evaluating Wollersheim's auditing sessions. However, the jury was entitled to disregard this innocent explanation and to believe Wollersheim's version of how and why Scientology divulged information he had supplied in confidence.

The intentional and improper disclosure of information obtained during auditing sessions for nonreligious purposes can hardly qualify as "religious expression." To clarify the point, we turn once again to a hypothetical situation which presents a rough analogy under a traditional religion. Imagine a stockbroker had confessed to a cleric in a confessional that he had engaged in "insider trading." Sometime later this same stockbroker leaves

the church and begins criticizing it and its leadership publicly. To discredit this critic, the church discloses the stockbroker has confessed he is an insider trader. This disclosure might be said to advance the interests of the cleric's religion in the sense it would tend to discourage former members from criticizing the church. But to characterize this violation of religious confidentiality as "religious expression" would distort the meaning of the English language as well as the United States Constitution. This same conclusion applies to Scientology's disclosures of Wollersheim's confidences in the instant case. And, since these disclosures do not qualify as "religious expression" they do not qualify for protection under the freedom of religion guaranties of the Constitution. (See Discussion at pp. 887-889, *supra.*)

### III. The Cause of Action for Negligent Infliction of Emotional Injury Must Be Reversed

For reasons set forth in section II, we have concluded Scientology is not constitutionally immunized from civil liability for its cumulative course of conduct to intentionally inflict emotional injury on Wollersheim. However, this course of conduct does not supply a suitable predicate for a cause of action based on *negligent* infliction of emotional injury. These actions are potentially actionable only when they are driven by an animus which can properly qualify them as "outrageous conduct." That is, they must be done for the purpose of emotionally injuring the plaintiff, or at the least with reckless disregard about their adverse impact on plaintiff's mental health. (*Nally* v. *Grace Community Church, supra,* 47 Cal.3d 278, 300; *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1487 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027].)

We have held in the prior section that Scientology and its leaders indeed engaged in these actions with an intent to emotionally injure Wollersheim. But this intentional activity was alleged in the intentional infliction of emotional injury count and was tried under that count. The negligence count, on the other hand, of necessity alleges a lesser degree of culpability and can be sustained only if the defendant could be liable even if the emotional injuries were caused by completely unintentional, merely negligent acts or omissions. (See *Slaughter* v. *Legal Process Courier Service* (1984) 162 Cal.App.3d 1236, 1249 [209 Cal.Rptr. 189]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 838, p. 195.)

In this context, Scientology is responsible only if it or any other religion could be held liable where through inadvertence something it or its leaders did damaged someone's business and thereby caused the businessman emotional injury. Or if it or any other religion could be held liable where it inadvertently revealed some information a member had disclosed in

confidence as part of a religious practice like auditing or a confession. Or if it or another religion could be held liable where its functionaries inadvertently said something during auditing or a sermon or a confession which triggered a listener's nascent mental illness.

At bottom, this question of duty is a matter of weighing competing public policy considerations. (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)[5] On balance, the religious freedom consideration outweighs any concern about spreading the cost of emotional injury, reducing the frequency of such emotional injuries, and the like. It is one thing to say we will impose liability when a religious organization intentionally or recklessly sets out to ruin a business or to reveal confidential information or to "audit" mercilessly or to "disconnect" a psychologically weak person from his family and thereby succeeds in emotionally injuring a member or former member of that religion. It is quite another to impose liability for negligent acts which inadvertently cause the same types of injuries. (See *Coon* v. *Joseph* (1987) 192 Cal.App.3d 1269, 1273 [237 Cal.Rptr. 873].)

Since we hold religious organizations owe no duty to members or former members with respect to these forms of injury, the cause of action for negligent infliction of emotional injury must be reversed. We need not, however, reverse the entire judgment.

Here, the jury found the Church liable for both negligent and intentional infliction of emotional distress. As we discussed above, there is substantial evidence to support a finding on the intentional infliction theory. We may fairly presume any damages awarded on the negligence theory are subsumed in the award for intentional infliction of emotional distress. Accordingly, any error in allowing the jury to consider the negligence theory does not affect the judgment. (See *Vahey* v. *Sacia* (1981) 126 Cal.App.3d 171, 179-180 [178 Cal.Rptr. 559]; *Bacciglieri* v. *Charles C. Meek Milling Co.* (1959) 176 Cal.App.2d 822, 826 [1 Cal.Rptr. 706].)

IV. THE TRIAL COURT PROPERLY DENIED APPELLANT'S MOTIONS TO DISMISS FOR FAILURE TO FILE BEFORE THE STATUTE OF LIMITATIONS HAD EXPIRED ON WOLLERSHEIM'S CAUSES OF ACTION

Scientology argues on appeal, as it did at virtually every opportunity below, that Wollersheim's causes of action are barred by the statute of

---

[5] " '[D]uty' is not an immutable fact of nature " 'but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.]" (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.)

limitations. At each and every juncture the various trial judges who heard these arguments rejected them. These judges ruled correctly that Wollersheim's causes of action were subject to the discovery rule. (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 356, p. 383.) The issue in each instance, thus, was *when* Wollersheim discovered, or should have discovered, all of the elements of his cause of action against Scientology. (See *Leaf* v. *City of San Mateo* (1980) 104 Cal.App.3d 398, 407-408 [163 Cal.Rptr. 711].) The trial judges properly ruled this issue, in turn, was a jury question. (*Id.* at p. 409.)

On appeal, this court is bound to uphold the jury's resolution of these factual questions unless we determine the findings are not supported by substantial evidence. After a careful review of the evidence, we conclude these findings about the timeliness of Wollersheim's filing of this case are supported by substantial evidence. Consequently, we affirm the rulings by the judges below and, furthermore, we likewise affirm the factual findings the jury impliedly made that Wollersheim did not discover and should not have discovered his causes of action until a time within the statutory period.

V. THE TRIAL COURT DID NOT COMMIT INSTRUCTIONAL ERROR OR EVIDENTIARY ERROR DURING THIS FIVE-MONTH TRIAL WHICH DENIED APPELLANT A FAIR TRIAL OR DUE PROCESS OF LAW

Appellant's final contention is that it was denied a fair trial and due process of law because of various instructional and evidentiary rulings the court made during this five-month trial. Considering the length of the trial it is surprising appellant was able to identify so few questionable rulings.

 Appellant first complains the trial court erroneously denied two instructions it requested. The first of these instructions restated the elements of the cause of action for intentional infliction of emotional distress or outrageous conduct with a slant favoring appellant's position.[6]

---

[6]The requested instruction reads: "Plaintiff's claim for intentional infliction of emotional distress, or outrageous conduct, is divided into several parts. [¶] First, plaintiff's claim that defendant engaged in outrageous conduct by subjecting plaintiff to its practice of auditing— which, as I shall instruct you, is the central religious practice of the religion of Scientology. [¶] Second, plaintiff claims that defendant caused plaintiff to separate from his family and friends as a condition for remaining in Scientology. [¶] Third, plaintiff claims that defendant 'attacked plaintiff's business' and induced those of his employees who were Scientologists to leave his employ. [¶] Fourth, plaintiff claims that defendant disclosed his auditing files in disregard of alleged promises of confidentiality to persons not authorized to receive them. [¶] All of these acts were allegedly undertaken to inflict severe emotional distress upon the plaintiff. [¶] The plaintiff is restricted in this case to the claims he set forth in his complaint. Evidence of any purported acts of the defendant not relating to the four categories I have just de-

As requested the instruction implied the jury was to disregard evidence of appellant's acts which did not fit precisely under the courses of conduct as appellant defined them. Actually the plaintiff's causes of action were broader in many respects than the descriptions the appellant requested. Moreover, some of the evidence introduced at the trial related to acts relevant to issues of appellant's state of mind (intent, motivation, and the like) and whether respondent was voluntarily participating in Scientology's practices or was doing so within a coercive environment. Accordingly, the instruction as requested would have been misleading to the jury. The trial court gave an instruction which set forth the elements of the cause of action. Any amplification of that instruction should have been more accurate than the one appellant requested and less misleading as to the full scope of the jury's range of inquiry. Thus it was not error to refuse to give this instruction.

 Appellant also complains about the refusal of one of its requested instructions ordering the jury in very specific fashion to disregard evidence presented which was relevant to the nonsuited fraud counts. Again, the requested instruction was stated in overbroad terms and unduly slanted in appellant's direction. For instance, as requested, it instructed the jury that "it must disregard evidence presented in this trial regarding statements purportedly made to [the plaintiff] to induce his participation in defendant church." If given, this instruction could have misled the jury into believing it must disregard evidence which provided context for the intentional infliction count or which went to the presence or absence of coercion and appellant's state of mind. So once again it was not error to refuse these instructions. (See *Wank* v. *Richman & Garrett* (1985) 165 Cal.App.3d 1103, 1113 [211 Cal.Rptr. 919]; *Lubek* v. *Lopes* (1967) 254 Cal.App.2d 63, 73 [62 Cal.Rptr. 36].)

In any event, on reviewing the total evidence offered in this trial, we find that even if it were error to refuse these instructions that error was not prejudicial. (*Henderson* v. *Harnischfeger* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353]; *Williams* v. *Carl Karcher Enterprises, Inc.* (1986) 182 Cal.App.3d 479, 489 [227 Cal.Rptr. 465]; see 9 Witkin, Cal. Procedure, *supra,* Appeal, § 352, pp. 355-356.) We cannot say that the giving of these instructions would have substantially enhanced the chances appellant would have prevailed.

Appellant likewise complains about evidentiary rulings. Although it mentions only a handful of specific incidents, it accuses the judge of admitting a mass of prejudicial evidence about actions Scientology took toward third

scribed to you may not be considered in determining whether plaintiff has established that defendant committed the tort of intentional infliction of emotional distress."

persons. In its brief appellant concedes this evidence was admissible under Evidence Code section 1101, subdivision (b) as proof of "intent" and "malice."[7] But it asks us to reverse the trial court under Evidence Code section 352 on grounds the relevance of this evidence was overwhelmed by its prejudicial effect.[8]

■ In reviewing the trial court's exercise of its discretion under section 352, appellate courts traditionally give great deference to the trial court's evaluation of relevance versus prejudice. (See *People* v. *Mota* (1981) 115 Cal.App.3d 227, 234 [171 Cal.Rptr. 212]; 1 Johnson, Cal. Trial Guide (1988) § 22.40, p. 22-43.) In the instant case we do not find an abuse of discretion. Much of the evidence appellant objects to was highly relevant to show the network of sanctions and coercive influences with which Scientology had surrounded Wollersheim. Much of the rest was highly relevant to show Wollersheim's state of mind while undergoing audit, disconnect and the like or appellant's state of mind, that is, its intent, malice, motives, and the like. Whatever prejudice to appellant may have accompanied introduction of this evidence it does not "substantially outweigh" the probative value of the evidence to important issues in this case.

Finally, appellant complains about the alleged prejudicial conduct of Wollersheim's counsel during the trial and closing argument. As was true of its claims of instructional and evidentiary evidence, appellant provides us with only a few examples of alleged prejudicial error and imply these are but the tip of the iceberg. It confines itself to this handful of incidents either because no other potentially prejudicial incidents occurred or because it expects this court to do its job by scouring the 25,000-page record for other examples to bolster its claim of error. If what appellant sets forth in its brief represent the only incidents it alleges as prejudicial conduct, we find them insufficient to justify reversal under applicable standards of prejudice. (*Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141, 144 [45 Cal.Rptr. 313, 403 P.2d 721] [attorney misconduct only requires reversal if "it is reasonable to conclude that a verdict more favorable to defendants would have been reached but for the error"]; see 9 Witkin, Cal. Procedure, *supra,* § 340, p. 346.) And if these brief examples were only an invitation to do

---

[7] "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

[8] "The court in its discretion may exclude evidence if its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, italics added.)

appellant's work in identifying prejudicial error in its opposing attorney's conduct, we decline that invitation. (*Horowitz* v. *Noble* (1978) 79 Cal.App.3d 120, 139 [144 Cal.Rptr. 710] [" 'The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment' "]; *Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257, 265 [107 Cal.Rptr. 175, 507 P.2d 1383, 90 A.L.R.3d 1185].)

VI. THE GENERAL DAMAGES AND PUNITIVE DAMAGES THE JURY AWARDED ARE EXCESSIVE FOR THE INTENTIONAL INFLICTION OF EMOTIONAL INJURY COUNT AND THUS THOSE DAMAGE AWARDS MUST BE REDUCED

In the previous section, we concluded the allegations which are supported by substantial evidence are enough to sustain a cause of action for intentional infliction of emotional injury against Scientology. But that conclusion does not determine whether the proved allegations support the level of damages the jury awarded under this cause of action. We turn to that issue now.

We are only concerned now with whether a reasonable juror could have found this level of "outrageous" conduct inflicted $5 million worth of emotional injury on Wollersheim. Similarly, we ask whether this level of "outrageous" conduct and Scientology's degree of intent in carrying it out warrant $25 million in punitive damages. We conclude these awards are excessive for the conduct alleged and proved in this case.

■ An award for compensatory damages will be reversed or reduced "upon a showing that it is so grossly disproportionate to any reasonable view of the evidence as to raise a strong presumption that it is based upon prejudice or passion." (*Koyer* v. *McComber* (1938) 12 Cal.2d 175, 182 [82 P.2d 941]; accord *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662] ["an appellate court may reverse an award only ' "When the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice" ' [Citations]"]; *Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727 [236 Cal.Rptr. 633]; see 8 Witkin, Cal. Procedure, *supra,* Attack on Judgment in Trial Court, § 46, p. 446.) Even under this stringent standard, it is manifest the jury's award here is excessive since it is so grossly disproportionate to the evidence concerning Wollersheim's damages.

Wollersheim's psychological injury although permanent and severe is not totally disabling. Moreover, even Wollersheim admits Scientology's con-

duct only aggravated a preexisting psychological condition; Scientology did not create the condition. While the jury awarded Wollersheim $5 million in compensatory damages, we determine the evidence only justifies an award of $500,000.

"It is well established that a reviewing court should examine punitive damages and, where appropriate, modify the amount in order to do justice." (*Gerard* v. *Ross* (1988) 204 Cal.App.3d 968, 980 [251 Cal.Rptr. 604]; *Allard* v. *Church of Scientology, supra,* 58 Cal.App.3d at p. 453.) In reviewing a punitive damages award, the appellate court applies a standard similar to that used in reviewing compensatory damages, i.e., whether, after reviewing the entire record in the light most favorable to the judgment, the award was the result of passion or prejudice. (See *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 388 [202 Cal.Rptr. 204].) However, the test here is somewhat more refined, employing three factors to evaluate the propriety of the award.

The first factor is the degree of reprehensibility of the defendant's conduct. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) "[C]learly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal." (*Ibid.*)

The second factor is the relationship between the amount of the award and the actual harm suffered. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928; *Seeley* v. *Seymour* (1987) 190 Cal.App.3d 844, 867 [237 Cal.Rptr. 282].) This analysis focuses upon the ratio of compensatory damages to punitive damages; the greater the disparity between the two awards, the more likely the punitive damages award is suspect. (*Seeley* v. *Seymour, supra,* 190 Cal.App.3d at p. 867; see *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469-470 [136 Cal.Rptr. 653].)

Finally, a reviewing court will consider the relationship of the punitive damages to the defendant's net worth. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928; *Devlin* v. *Kearny Mesa AMC/Jeep Renault, Inc., supra,* 155 Cal.App.3d at p. 390.) In applying this factor courts must strike a proper balance between inadequate and excessive punitive damage awards. "While the function of punitive damages will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort, the function also will not be served by an award which is larger than necessary to properly punish and deter." (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d at p. 391.)

As to the punitive damage award, we find it is not commensurate with Scientology's conduct *in this case*. This is not a situation where the centerpiece of the case involved a Church-ordered physical beating or theft or criminal fraud against Wollersheim. The "outrageous conduct" was less outrageous and more subtle than that. We further note Wollersheim's counsel in the full flood of his emotional summation at the conclusion of this lengthy trial only deigned to urge the jury to return punitive damages of *as much as* "six or seven million dollars."

The evidence admitted at trial supported the finding the appellant church had a net worth of $16 million at the time of trial. Accepting these figures as true, the jury awarded Wollersheim *150 percent of* appellant's net worth in punitive damages alone—195 percent if compensatory damages are included. This ratio is well outside the permissible range established in other appellate cases. (*Seeley* v. *Seymour, supra,* 190 Cal.App.3d at p. 869 [punitive damages reversed; award was 200 percent of defendant's net worth]; *Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1012 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125] [punitive damages reduced; initial award was 35 percent of defendant's net worth]; *Egan* v. *Mutual of Omaha Insurance Co.* (1979) 24 Cal.3d 809, 824 [169 Cal.Rptr. 691, 620 P.2d 141] [punitive damages reversed; award was 58 percent of defendant's net income]; *Allard* v. *Church of Scientology, supra,* 58 Cal.App.3d at pp. 445-446, 453 [punitive damages reversed; award was 40 percent of defendant's net worth]; compare *Devlin* v. *Kearny AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d at pp. 391-392 [punitive damages affirmed where award was 17.5 percent of defendant's net worth]; *Schomer* v. *Smidt* (1980) 113 Cal.App.3d 828, 836-837 [170 Cal.Rptr. 662] [punitive damages affirmed; award was 10 percent of defendant's net worth]; *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1100 [234 Cal.Rptr. 835] [punitive damages affirmed; award was 7.2 percent of defendant's net income].) Respondent asserts appellant's true net worth approaches $250 million not $16 million and thus the punitive damage award is not excessive. However, respondent failed to prove the higher net worth figure at trial. Accordingly we reduce the punitive damage award to $2 million.

## DISPOSITION

The judgment is reversed as to the cause of action for negligent infliction of emotional injury. The judgment as to the cause of action for intentional infliction of emotional injury is modified to reduce the compensatory damages to $500,000 and the punitive damages to $2 million. In all other

respects the judgment is affirmed. Each party to bear its own costs on appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied August 17, 1989, and the petition of respondent and appellant for review by the Supreme Court was denied October 26, 1989.