[Nos. H003864, H003647. Sixth Dist. Nov. 30, 1989.]

CLAUDIA LENORE SNYDER, Plaintiff and Appellant, v. EVANGELICAL ORTHODOX CHURCH et al., Defendants and Respondents.

CHARLES RONALD ROBERSON, Plaintiff and Appellant, v. EVANGELICAL ORTHODOX CHURCH et al., Defendants and Respondents.

■■■■■■■■

**COUNSEL**

Philip S. Liberty and Timothy J. Morgan for Plaintiffs and Appellants.

James C. Hyde, Popelka, Allard, McCowan & Jones, Popelka & Allard and Kent G. Washburn for Defendants and Respondents.

**OPINION**

ELIA, J.—Appellants Charles Ronald Roberson and Claudia Lenore Snyder sued respondents Evangelical Orthodox Church and several named and unnamed defendants on a plethora of intentional tort claims based primarily on respondents' conduct in publicly revealing details of appellants' confidential communications to members of the congregation and the public. On appeal, appellants argue the trial court erred in granting partial summary judgment on Roberson's false imprisonment claim and in dismissing all appellants' other claims, with the exception of Snyder's malpractice and Roberson's trespass and conversion claims, for lack of subject matter jurisdiction. We conclude that summary judgment was properly granted, but that the court's dismissal of appellants' claims on jurisdictional grounds was in error. We therefore affirm in part, reverse in part and remand with instructions.

On October 15, 1984, appellant Charles Roberson filed a complaint alleging causes of action for invasion of privacy, breach of fiduciary duty, false imprisonment, emotional distress, negligent infliction of physical harm, interference with prospective economic advantage, injurious falsehood, trespass, conversion and conspiracy. On December 14, 1984, appellant Claudia Snyder filed a complaint alleging causes of action for damages, malpractice, breach of fiduciary duty, emotional distress, negligence, negligent infliction of physical harm and conspiracy.

The complaints allege the following facts: Appellant Roberson was a bishop and both appellants were members of respondent church, the Santa Cruz Dioceses of the Evangelical Orthodox Church. Respondent Peter Gillquist is the presiding Archbishop for the Western Region and head of

the Holy Synod of the Evangelical Orthodox Church. "He is the person to whom the Archdiocesans are directly responsible and to whom they report. He has legislative, administrative and judicial authority to implement the will of the Holy Synod in directing the affairs of the jurisdiction. He has, at the recommendation of the Regional Synod, authority to suspend a Diocesan Bishop for matters of morals and doctrine, subject to review at the next Holy Synod." Respondent Richard Ballew is the "Coajator (assistant)" to the archbishop. Respondent Weldon Hardenbrook is the "Diocesan Bishop for the Santa Cruz Dioceses" and respondent Terry Somerville is an "Archpresbyter and an Elder in the San Lorenzo Dioceses." Respondent Gordon Walker is the "Archdiocesan Bishop of the Eastern Region."

On December 12, 1983, Roberson confessed to Hardenbrook that he was involved in an extramarital sexual relationship with Snyder. Hardenbrook requested Roberson immediately accompany him to Santa Barbara to confess to Bishop Gillquist. Roberson repeated his confession to Bishop Ballew, Bishop Gillquist's coajator. Roberson asked Hardenbrook and Ballew to keep his confession in confidence, and they promised to do so.

On December 15, 1983, Snyder made a similar confession to Hardenbrook. A promise of confidentiality was also requested and made as to this confession.

Hardenbrook and Ballew disclosed these confidences to Bishop Gillquist and to the church board of elders, as well as to numerous other persons.

On December 18, 1983, Hardenbrook divulged Roberson's and Snyder's confidences to the assembled congregation in Sunday services. Hardenbrook then excommunicated Roberson and "cast his spirit" from the church.

On December 20, Snyder sought help from respondent Nixon, a licensed marriage and family counselor. Despite promises of confidentiality, Snyder alleges Nixon divulged information from this meeting to the church board of elders and to the other respondents. The church then communicated this information to all church members.

Appellants also allege that respondent Somerville disclosed their confidences to a "gathering of local priests, ministers, pastors and guests" in June 1984.

As a result of this conduct, appellants were shunned by friends, family and members of the congregation.

Defendants filed answers denying all the allegations in the complaint and alleging as an affirmative defense that the court lacked jurisdiction over the action because "the conduct complained of is ecclesiastical in nature."

On June 9, 1987, respondents moved for partial dismissal and partial summary judgment against Roberson. On August 10, 1987, the court granted both motions. Roberson's remaining claims for trespass and conversion have apparently been settled, as has Snyder's malpractice claim against Nixon. On August 27, 1987, respondents moved for partial dismissal against Snyder. This motion was granted on October 26, 1987. These appeals ensued. We have consolidated them for the purposes of review and decision.

## PARTIAL SUMMARY JUDGMENT

■ We first reach appellant Roberson's claim that the trial court erred in granting summary judgment on his false imprisonment claim.

Summary judgment is authorized by Code of Civil Procedure section 437c, and is appropriate where there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. ■ An appellate court independently analyzes all the papers and evidence presented in connection with this motion (*Gray* v. *San Francisco Gun Exchange, Inc.* (1989) 207 Cal.App.3d 151, 154 [254 Cal.Rptr. 581]; *Fowler* v. *Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 37 [241 Cal.Rptr. 539]) and makes an "independent determination of their construction and effect as a matter of law. [Citation.]" (*Hayman* v. *Block* (1986) 176 Cal.App.3d 629, 640 [222 Cal.Rptr. 293].) Doubts as to the propriety of summary judgment are resolved against granting the motion. (*Gray, supra*; *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 458 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601]; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

■ The tort of false imprisonment is the " 'nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.' " (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1123 [252 Cal.Rptr. 122, 762 P.2d 46], cert. den. 490 U.S. 1084 [104 L.Ed.2d 670, 109 S.Ct. 2110] (1989), quoting *City of Newport Beach* v. *Sasse* (1970) 9 Cal.App.3d 803, 810.) A person is falsely imprisoned if he or she is wrongfully deprived of his or her freedom to leave a particular place by the conduct of another. (*Molko, supra*, quoting *Schanafelt* v. *Seaboard Finance Co.* (1951) 108 Cal.App.2d 420, 422-423 [239 P.2d 42].) The tort of false imprisonment has the same definition as the criminal violation in Penal Code section 236. (*Molko, supra*; *People* v. *Martinez* (1984) 150 Cal.App.3d 579, 599 [198 Cal.Rptr. 565].)

■ In some respects, the facts in *Molko* are similar to those alleged here: Appellant, a former member of the Unification Church, contended she

was falsely imprisoned because although she was not restrained physically, and was theoretically free to depart at any time, she was constrained by the harm she felt would result if she left the Unification Church's camp; that her family " 'would be damned in Hell forever and they would forever feel sorry for having blown their one chance to unite with the Messiah and make it to Heaven.' " *Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1123.)

In this case the papers before the trial court on the summary judgment motion reveal that after Roberson made his confession to Bishop Ballew in Santa Barbara, Ballew asked Roberson to move to Goleta, where the church was headquartered, to "accept his pastoral guidance and care." Roberson asserts he was "ordered to abandon his wife, two children of his marriage and the child which may have been his by Claudia Snyder." Ballew also conditioned the absolution of Roberson's sins on his pursuing this course of action. Roberson then told Ballew that he needed a week to decide whether to do this.

Hardenbrook then drove Roberson to a motel or a cabin in Boulder Creek and told him that "he wanted him to stay in the motel for one week to struggle for his soul without outside contact." Roberson told Hardenbrook he was willing to do that.

Roberson contends he was left in this cabin without transportation or a telephone, and was ordered to have no outside contacts with anyone, including his family. He felt "trapped" and "blackmailed" because Ballew told him that if he cooperated, his adulterous relationship would be "covered."

During that week, however, Roberson contacted both Snyder and his teenage daughter at least twice; went on a drive with both women; left the motel and took a walk; was visited in the motel by Snyder; went out to dinner with Snyder with Hardenbrook's permission; and returned home to talk to his wife. Roberson's wife told Hardenbrook about this visit. Hardenbrook then ordered Roberson to get in his car and drive to Goleta. Roberson apparently started to do so, but abandoned the journey.

It is evident from this record that Roberson's agreement to complete a week in isolation was consensual and that during this week he was free from physical restraint; he both left the confines of the cabin and had contact with Snyder and members of his family. In this respect this case is quite distinct from *O'Moore v. Driscoll* (1933) 135 Cal.App. 770, 773 [28 P.2d 438], in which appellant was physically confined against his will for over a year, and in which liability for false imprisonment was upheld.

Roberson protests, however, that his agreement to remain in isolation for a week was induced by the threats to reveal his confidences, and by the threat that his sins would not be absolved if he did not comply. This argument is indistinguishable from that rejected in *Molko*. As in that case, Roberson's theory implicates respondents' beliefs, since it "seeks to make the Church liable for threatening divine retribution." (*Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1123.) Our Supreme Court held that such threats were protected religious speech which could not form the basis of tort liability. (46 Cal.3d at pp. 1123-1124.) Accordingly, no liability for false imprisonment could be based on the facts alleged here, and we conclude the trial court properly granted summary judgment on this claim.

## DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

■ Respondents successfully argued that the trial court should dismiss appellants' complaints because they were ecclesiastical in nature. The court dismissed all but Snyder's professional malpractice claim, and all but Roberson's conversion and trespass claims, on the grounds that it lacked jurisdiction over their subject matter. Appellants claim this was error.

■ It is axiomatic that the First Amendment of the Constitution (made applicable to the states through the Fourteenth Amendment Due Process clause [see *Cantwell v. Connecticut* (1940) 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352]; *Everson v. Board of Education* (1947) 330 U.S. 1 (91 L.Ed. 711, 67 S.Ct. 504, 168 A.L.R. 1392)]) guarantees both free religious expression and governmental noninvolvement in religion. California's constitution contains similar guarantees. (Cal. Const., art. I, § 4.) While the "free exercise clause" protects religious beliefs absolutely, however, it protects religious actions only qualifiedly. (*Sherbert v. Verner* (1963) 374 U.S. 398, 402-403 [10 L.Ed.2d 965, 969-970, 83 S.Ct. 1790]; *Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1113; see also Tribe, American Constitutional Law (2d ed. 1988) § 14-6 at p. 1183 et seq.) This limitation was first articulated by the Supreme Court in *Reynolds v. United States* (1878) 98 U.S. 145, 166 [25 L.Ed. 244, 250]: "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." (Cf. Tribe, *supra.*)

■ The application of tort law to activities of a church in furtherance of its religious beliefs is clearly an exercise of state power, but where the imposition of liability would result in abridging the free exercise of these beliefs, it is barred. (*Wollersheim v. Church of Scientology* (1989) 212 Cal.App.3d 872, 883 [260 Cal.Rptr. 331]; *Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1114; *Paul v. Watchtower Bible & Tract Soc. of New York* (9th Cir. 1987) 819 F.2d 875, 880; *New York Times Co. v. Sullivan* (1964)

376 U.S. 254, 277 [11 L.Ed.2d 686, 704-705, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

█ Respondents persuaded the trial court that it lacked jurisdiction on the general ground that appellants' causes of action were religious in nature. Religious disputes can take a number of forms, however, and do not always result in immunity from liability. Not all of the authority respondents presented to the trial court is applicable: This is not a church property dispute; it is not a dispute between various factions of the church; it is not a dispute about the propriety of church discipline, or about the correctness of church authority. The precise issue confronting the trial court was whether respondents were insulated from civil tort liability for their actions. █ We proceed to outline the test it should have used, and should use on remand, to determine this.

A court must first ask two preliminary questions: Is this a religion, and does the course of conduct alleged qualify as a religious expression? If both these questions can be answered in the affirmative, the court must then ask if the alleged conduct inflicts so much harm that there is a compelling state interest in discouraging it which outweighs the values served in allowing religious freedom. (*Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1113.) For if government action—here, in the form of tort liability—burdens religious conduct, the importance of the state's interest must be weighed against the severity of the concomitant burden on religion. (*Ibid.*) █ This test was recently articulated in *Wollersheim* v. *Church of Scientology, supra,* 212 Cal.App.3d at pages 884-885, as follows: "[I]n certain circumstances [government] can burden an expression of belief which adversely affects significant societal interests. To do so, the burden on belief must satisfy a four-part test: First, the government must be seeking to further an important—and some opinions suggest a compelling—state interest. Secondly, the burden on expression must be essential to further this state interest. Thirdly, the type and level of burden imposed must be the minimum required to achieve the state interest. Finally, the measure imposing the burden must apply to everyone, not merely to those who have a religious belief; that is, it may not discriminate against religion. . . . [¶] [T]he more important the interest the state seeks to further, the heavier the burden it can constitutionally impose on the more important forms of expressing religious belief." (See also *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1113, citing *Braunfeld* v. *Brown* (1961) 366 U.S. 599, 607 [6 L.Ed.2d 563, 568-569, 81 S.Ct. 1144].)

█ In addition, for the purposes of a motion to dismiss, a court must assume the allegations made in the complaint to be true. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 263, p. 564; *April*

*Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 815 [195 Cal.Rptr. 421]; *Van Schaick* v. *Church of Scientology of Cal., Inc.* (D.Mass. 1982) 535 F.Supp. 1125, 1131.)

██ Applying these principles to this case, the trial court could have concluded, based on the allegations of the complaints, that respondent was indeed a religion. Appellants did not, and do not contest respondents' status as such. (Cf. *Van Schaick* v. *Church of Scientology of Cal., Inc., supra,* 535 F.Supp. at p. 1143.) It does not appear from the record, however, that the second preliminary question—whether respondents' course of conduct qualified as a religious expression—was ever asked. Nor, had the question been asked, could it have been answered on the record before the court. Respondents' answers state as an affirmative defense that "any conduct made by or on behalf of defendants was consistent with church doctrine, tenets and practice and was done in good faith . . . ." In their memoranda in support of the motion to dismiss, respondents again claim the adjudication of appellants' claims would "call upon the court to review and interpret the church's doctrines, teachings and practices with respect to penitential communications, confession and the privacy thereof. It would necessitate a decision as to whether or not the bishop had the right to discuss any such conversations with the church's board of elders and whether or not the church's doctrines, teachings and practices called upon the bishop and/or the board of elders to reveal the content of the communication to the congregation."

Respondents have not alleged, however, that the specific acts complained of were conduct engaged in pursuant to church doctrine. (See *Wollersheim* v. *Church of Scientology, supra,* 212 Cal.App.3d at p. 897; *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1122.) The trial court was not told, and we do not know, inter alia, whether it is a canon of respondents' belief that confessions (penitential or not) are revealed to the congregation unless the offender repents; whether it is church practice for the substance of a confession to be shared among church officials; or whether it is consistent with church doctrine to reveal the substance of a confession to anyone outside the church, and if so, under what circumstances.

██ We also note that "[t]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . ." (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 714 [67 L.Ed.2d 624, 631, 101 S.Ct. 1425].) While courts must be mindful that they may not question the verity of religious beliefs or practices (*United States* v. *Ballard* (1944) 322 U.S. 78, 86 [88 L.Ed. 1148, 1153-1154, 64 S.Ct. 882]), they must not be the "arbiters of scriptural interpretation" (*Thomas* v. *Review Bd., supra,* 450 U.S. at p. 716 [67 L.Ed.2d at p. 632]), and must defer

to a church on matters of ecclesiastical doctrine (*Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 709 [49 L.Ed.2d 151, 162-163, 96 S.Ct. 2372]; *Higgins v. Maher* (1989) 210 Cal.App.3d 1168, 1170 [258 Cal.Rptr. 757]), a court may nonetheless need to examine extrinsic evidence to determine the sincerity of respondents' beliefs and their centrality to their religion. The latter inquiry turns on "the role that the rite or belief plays in the ritual and theology of the religion in question." (*Intern. Soc. for Krishna, etc. v. Barber* (2d. Cir. 1981) 650 F.2d. 430, 441.) The goal, as the Second Circuit pointed out in *Barber,* is to "protect only those beliefs which are held as a matter of conscience." (*Ibid.*)

█ Even should respondents, on remand, be able to substantiate that the conduct which is the subject of the complaint was taken pursuant to church policy, the trial court's inquiry will not be at an end. █ "Causes of action based upon some proscribed conduct may, thus, withstand a motion to dismiss even if the alleged wrongdoer acts upon a religious belief or is organized for a religious purpose." (*Van Schaick v. Church of Scientology of Cal., Inc., supra,* 535 F.Supp. at p. 1135.) For "[u]nder the banner of the First Amendment provisions on religion, a clergyman may not with impunity defame a person, intentionally inflict serious emotional harm on a parishioner, or commit other torts." (*Madsen v. Erwin* (1985) 395 Mass. 715 [481 N.E.2d 1160, 1167].) █ The court must next consider whether the interests which are invaded by respondents' religious practices are of sufficiently significant interest to the state to warrant the application of tort liability.

That inquiry alone, because of differing lines of authority, may itself be subject to appellate review. In *Paul v. Watchtower Bible & Tract Soc. of New York, supra,* 819 F.2d 875, for instance, appellant complained that the practice of shunning engaged in by Jehovah's Witnesses pursuant to that religion's interpretation of canonical text caused her emotional distress, alienated affections and harmed her reputation. She argued these were significant state interests which should be protected through the application of state tort law. (*Id.* at p. 878.) The Ninth Circuit rejected these claims on the ground that the imposition of tort damages would constitute a direct burden on respondents' religion. (*Id.* at p. 880.)

A similar claim was upheld by the Pennsylvania Supreme Court in *Bear v. Reformed Mennonite Church* (1975) 462 Pa. 330 [341 A.2d 105], however. In that case, the appellate court reversed the trial court's grant of a demurrer, and allowed appellant to proceed with his claim that shunning might excessively interfere with areas of " 'paramount state concern,' i.e. the maintenance of marriage and family relationship[s], alienation of affection[s] and the tortious interference with a business relationship" which

that state's courts might have authority to regulate. (*Id.* at p. 107; cited with apparent approval in *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1114; see also, generally, Annot., 40 A.L.R.4th 1062 [liability of religious association for damages for intentionally tortious conduct in recruitment, indoctrination, or related activity].)

In *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092, our Supreme Court determined that the state's compelling interest in allowing tort liability for the church's fraudulent and deceptive recruitment practices—its interest in preventing its citizens from submitting unknowingly to the church's practices, and its interest in protecting the family—outweighed the slight concomitant burden on respondent's religious conduct. (*Id.* at pp. 1117-1118.) The court also concluded that a jury issue existed as to whether the church's conduct in that case was sufficiently "extreme and outrageous" to support a cause of action for intentional infliction of emotional distress. (*Id.* at pp. 1120-1123; see also *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 300 [253 Cal.Rptr. 97, 763 P.2d 948], cert. den. 490 U.S. 1007 [104 L.Ed.2d 159, 109 S.Ct. 1644] (1989).)

At least one post-*Molko* case, *Wollersheim,* has upheld the validity of a cause of action for intentional infliction of emotional distress. In *Wollersheim* v. *Church of Scientology, supra,* 212 Cal.3d 872, the Second Appellate District upheld a jury verdict for the plaintiff which he had advanced on the basis of the Church of Scientology's conduct. (*Id.* at p. 901.)

In addition, the *Wollersheim* court affirmed as to a cause of action based, like appellants' here, on improper disclosure of private information revealed by appellant to respondent Church of Scientology in "auditing" sessions, which perform "a similar function for Scientology as sermons and other forms of mass persuasion do for many religions." (*Wollersheim* v. *Church of Scientology, supra,* 212 Cal.App.3d at p. 891.) The court concluded that these disclosures did not qualify for First Amendment protection, stating "[t]he intentional and improper disclosure of information obtained during auditing sessions for nonreligious purposes can hardly qualify as 'religious expression.'" (*Id.* at p. 899.)

*Wollersheim* cites no appellate authority for this conclusion; indeed, there may be none. In 1986, one commentator reported that although "the vast majority of jurisdictions in the United States recognize an *evidentiary* privilege for communications between clergy and counselee . . . . [¶] [a]pparently there are no generally reported opinions where a counselee or communicant has sought to hold a religious officer liable in tort for such an improper disclosure, nor do the statutes and rules of court address this eventuality." (Italics added, footnote omitted.) (Esbeck, *Tort Claims*

*Against Churches and Ecclesiastical Officers: The First Amendment Considerations* (1985) 89 W.Va.L.Rev. 1, 84-85.) While *Wollersheim* may be the only appellate authority on this point, we discern no constitutional or other reason to disagree with its conclusion. We therefore hold appellants are not barred from seeking recovery on the basis of such a claim.

If the trial court on remand should determine, as in *Wollersheim,* that there was no religious purpose for the disclosure of appellants' confidential communications, respondent church's conduct in making these disclosures will not qualify as religious expression and enjoy the possibility of constitutional immunity. If the court concludes, however, that this or any of the other alleged conduct on which appellants' claims are based qualifies as religious expression, the trial court must balance the importance to the state of the interest invaded against the burden which would result from imposing tort liability for such a claim. Even if the burden is significant, appellants' claims will survive a motion to dismiss if the state's interests are significant, and no less restrictive burden than the possibility of eventual tort liability is available. (*Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1118.)[1]

We are mindful that civil courts must abstain from resolving disputes which turn on extensive inquiry into "religious law and polity," (*Serbian Orthodox Diocese v. Milivojevich, supra,* 426 U.S. 696, 709 [49 L.Ed.2d 151, 162]) and must avoid questions "made to turn on the resolution . . . of controversies over religious doctrine and practice," since doctrine is a matter of "purely ecclesiastical concern." (*Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 665, 89 S.Ct. 601]; see also Note, *Constitutional Law—First Amendment—The Role of Civil Courts in Church Disputes* (1977) Wis.L.Rev. 904 et seq.) Determining when intervention by civil courts in religious matters is appropriate will always be a difficult task, but the alternative—the strict deference exercised by the trial court here—"uniformly favors one class of parties, the hierarchy, over its challengers, so that errors will consistently favor one side. . . . This raises greater constitutional problems than the occasional errors, randomly distributed among parties, that may result from an erroneous factual determination made by a neutral forum." (Ellman, *Driven From the Tribunal: Judicial Resolution of Internal Church Disputes* (1981) 69 Cal.L.Rev. 1378, 1413.) We therefore hold that on a motion to dismiss for lack of jurisdiction, it is insufficient for respondents to no more than generally allege, as a substantive defense to tort liability, that their conduct was religious in nature.

---

[1] We recognize that respondents may be able to interpose defenses or qualified privileges, but these are generally not raised by a motion to dismiss. (Cf. *Madsen v. Erwin, supra,* 481 N.E.2d at p. 1167.)

In appeal No. H003647, the partial summary judgment is affirmed, and the order granting partial dismissal is reversed. In appeal No. H003864, the order granting partial dismissal is reversed. The causes are remanded for further proceedings consistent with this opinion. Costs to appellants.

Capaccioli, Acting P. J., and Premo, J., concurred.