[No. C009041. Third Dist. Oct. 17, 1991.]

NED VUKOVICH et al., Plaintiffs and Appellants, v.
MILO RADULOVICH et al., Defendants and Respondents.

**COUNSEL**

Michael H. Chisholm for Plaintiffs and Appellants.

Jay-Allen Eisen, Ann Perrin Farina and Paul Nicholas Boylan for Defendants and Respondents.

**OPINION**

**SIMS, J.**—St. Sava Serbian Orthodox Church of Jackson, California (St. Sava) was formerly affiliated with the Serbian Eastern Orthodox Diocese of the United States and Canada, which in turn was a subordinate body of the Serbian Orthodox Church (the Mother Church), a hierarchical church centered in Belgrade, Yugoslavia.

Following the defrocking by the Mother Church in 1963 of the bishop who presided over the Church in America and the reorganization of the American Church into three dioceses, including the Western Diocese (the Diocese), St. Sava chose to separate from the Mother Church and to operate independently of both the Diocese and the rival church organization later established by the defrocked bishop.[1]

This state of affairs eventually became unsatisfactory to many members of St. Sava, who wished to rejoin the Mother Church. After investigating the

---

[1]The history of these proceedings is recited in the opinion of this court in *St. Sava Mission Corp.* v. *Serbian Eastern Orthodox Diocese* (1990) 223 Cal.App.3d 1354 [273 Cal.Rptr. 340]. The underlying issue in that case was whether St. Sava Mission, a parcel of church property, belonged to the members of St. Sava or to the Diocese. The status of the mission is not directly implicated in the present dispute.

subject, St. Sava's executive board (the Board) called a special meeting of the membership to vote on reaffiliation. A majority of those whose votes were counted voted to reaffiliate with the Mother Church.

Plaintiff Ned Vukovich and 64 other members of St. Sava brought a class-action suit against the Board, seeking to invalidate the vote for alleged violations of church bylaws and to prevent any further steps toward reaffiliation. After a court trial, the trial court found and ruled that it had no jurisdiction to consider whether the bylaws had been violated because the dispute before it was essentially religious and ecclesiastical, therefore beyond the authority of a civil court to adjudicate. The court then entered judgment for the Board. Plaintiffs appealed. We shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *St. Sava's bylaws.*

St. Sava is governed by a document titled "Constitution and By-Laws [*sic*]." The bylaws prescribe the manner in which all business of the church is to be carried out.

Under the bylaws, membership in the church is open to every person 18 years of age or over who has been baptized or confirmed in the Serbian Orthodox faith or another Eastern Orthodox faith, who lives within a 40-mile radius of St. Sava or who lives outside that radius but has an immediate relative who is a current member of the church, and who swears to accept the constitution and bylaws of the church. Membership consists of two classes: voting and nonvoting. Any member who has attended at least two regularly scheduled church meetings in the last calendar year is a voting member; all others are nonvoting members. Nonvoting members "shall not have the right to vote and hold office but they will have all of the rights and privileges of a Voting member as it relates to graves and such other rights granted to Voting members of the Church."

Routine church business is transacted at the regularly scheduled meetings of the church. The "Assembly" of the church consists of members who have met all their membership obligations. All decisions brought about by the Assembly are made by majority vote of the voting members in good standing present at the meeting.

A special meeting of the Assembly may be called by the Board upon receipt of a petition signed by one-third of the voting members. A decision on "Any matter pertaining to the Church property or economic status of the Church . . . ." must be made at a special meeting. Such meeting may be

called "only upon notification in writing of said meeting to each and every member of the Assembly."

B. *Church property.*

St. Sava was founded in 1884. It is the oldest continuously existing Serbian Orthodox parish in the United States.

Originally, title to all parish property was held by the Russian Orthodox Church. In 1923 the members of St. Sava brought a successful suit to vest title in certain members as trustees. In 1942 a friendly suit was brought to transfer title to the entire membership of St. Sava. The property was conveyed by grant deed to "the Serbian Orthodox Church of Jackson, California."

St. Sava's bylaws specify that the Assembly's real and personal property belongs exclusively to the Assembly, under the custody and control of the Board.

C. *Reaffiliation proceedings.*

At a meeting of the Assembly in December 1988 a petition requesting reaffiliation with the Diocese was presented to the Board. The petition bore the signatures of 36 voting members, more than one-third of the voting members of the church.[2] As the language of the petition is significant for the resolution of this case, we quote it in full:

"We the undersigned would like to state and petition the following: That we as members of St. Sava Serbian Orthodox Church in Jackson, California, have been for too long ecclesiastically in error by being in the unlawful state of 'neutrality.' This neutrality has separated us from God's Grace and the mainstream of Universal Orthodoxy[,] casting us as outlaws of the Church[.]

"The head of every Orthodox Christian Church is the Bishop and having no Bishop we have no direction, no progression, no leadership, no status in the Church. Like a branch cut off from its tree we are rapidly withering. Without a Bishop, all of our Sacraments have no validity. This includes the Liturgy and especially Holy Communion. We as Orthodox Christians cannot tolerate this situation any longer.

"It is our firm intent to bring our Church back to its original glorious, sacred and lawful status which was established by her founder Jesus Christ

---

[2]The church had 141 members, of whom 56 were voting members.

our Lord and Saviour and upheld by the Holy Apostles. And back to the proper, lawful and canonical stand of Fr. Sebastian Dabovich who left us a legacy to perpetuate the sacred laws of the Church forever.

"Our aim is to go forward, to once again see Orthodoxy blossom in our midst.

"Christian disunion is the greatest tragedy of all. Let us unite and bring our Church back into the fold. Let us restore the broken link in the Apostolic Chain and once again become one with the ONE HOLY AND APOSTOLIC UNIVERSAL ORTHODOX CHRISTIAN CHURCH."

The Board stated it would investigate the effect of reaffiliation, in particular with regard to church property, and would report back to the Assembly at the next regular meeting, scheduled for February 12, 1989.

The Board met with Bishop Chrysostom of the Diocese on February 5, 1989. The bishop told the Board that reaffiliation would have no effect on the ownership or control of church property and that the Diocese did not want to take any of the church's property away from its members. The only immediate effect of reaffiliation would be that St. Sava would once more come under the religious control of the Diocese. Eventually St. Sava would have to conform its bylaws with those of the Diocese. In addition, members would have to pay dues to the Diocese. The normal figure was $51 per voting member per year, but the amount was negotiable, and the Diocese did not want to put St. Sava into an economic bind.

At the February 12, 1989, meeting of the Assembly, the Board reported to the members on its meeting with the bishop. After the members discussed the pros and cons of reaffiliation, Board President Milo Radulovich announced there would be a special meeting on March 19 to hold a vote on the question.

The Board sent notice of the March 19 meeting to all voting members of the church by letter dated February 19, 1989. It did not at that time send notice to the nonvoting members. However, after plaintiff Ned Vukovich (not a member of the Board) on his own initiative notified the nonvoting members of the upcoming meeting, the Board wrote a letter to all church members dated March 13, 1989, announcing the meeting and assuring nonvoting members they were welcome to come.

At the March 19 meeting, 29 voting members voted for reaffiliation with the Diocese, while 24 voted against it. Plaintiff Vukovich and others attempted to have the votes of between 20 and 30 nonvoting members against

affiliation counted, but the Board refused to count them. Those who were dissatisfied with the outcome asserted the Board had violated the bylaws by (1) failing to notify all members of the meeting pursuant to article 22 and (2) failing to count the votes of all members without regard to "voting" or "non-voting" status, as had purportedly been the Board's custom in the past. Board President Radulovich announced that in view of the importance of the issue and the strength of feelings on both sides, the Board would look into whether the bylaws could be interpreted to allow nonvoting members to vote, and if so a final decision would not be made based on a five-vote margin among the voting members; however, this did not mean the vote taken was invalid.

Following the March 19 meeting, the Board sought the advice of three attorneys as to whether it could allow nonvoting members to vote. The attorneys agreed that the March 19 vote was legal and binding and that any attempt to set it aside or to hold a second vote would violate St. Sava's bylaws.

On April 3, 1989, the Board wrote a letter to Bishop Chrysostom of the Diocese, asking the following material questions: "1. If the Jackson church affiliates with Diocese of the Serbian Orthodox Church in the U.S. and Canada thru [sic] the Western diocese would we have to transfer the property deeds to your Diocese? [¶] 2. In the event of affiliation would the Opstina [congregation] have to share or give any portion of its Treasury to the Diocese? (Apart from dues and recurring payments such as the pension fund, etc [sic]). [¶] . . . [¶] 4. What are your expectations in the event of affiliation as regards direct control in the day to day operations of our Jackson church?"

On April 5, the Diocese replied as follows: "1) If the Jackson Church affiliates with the Serbian American Western Diocese, which is a part of the Serbian Orthodox Church in the U.S.A. and Canada—under the jurisdiction of the Serbian Patriarhate [sic] in Belgrade, your Church would not have to transfer its property deeds to our Diocese. St. Sava Church in Jackson will be incorporated with the Serbian American Western Diocese like all other parishes within our Diocese. ([S]ee the text of the Article of incorporation and Article 26 of the Constitution[,] Rules and Regulations [sic] of the S.O. Church in the U.S.A. and Canada.[)] [3] [¶] 2) In the event of affiliation, St.

---

[3]Article 26 of the constitution of the Serbian Orthodox Church in the United States of America and Canada provides in pertinent part:

"1. The Church and other buildings constituting parish property shall be used in the service of the religious, educational, recreational and philanthropic needs of the parish. Parish property shall at all times be held subject to and administered in accordance with this

Sava Church in Jackson, [*sic*] would not have to transfer any part of its Treasury to the Diocese (apart from dues according to the membership of your parish). . . . [¶] 4) His Grace Bishop Hrizostom [*sic*] expects from you to work and comunicate [*sic*] with him like all other parishes according to the Constitution[,] Rules and Regulations of the Serbian Orthodox Church in the U.S.A. and Canada."

At the next regular meeting of the Assembly, on April 9, 1989, the Board conveyed to the membership the substance of its discussions with the attorneys and its correspondence with the Diocese. Despite the vociferous objections of some members, the Board affirmed that the March 19 vote was binding on the Assembly.

D.   *The lawsuit.*

On April 20, 1989, plaintiffs filed a complaint in Amador County Superior Court for declaratory and injunctive relief and an ex parte application for a temporary restraining order (T.R.O.), seeking (1) a declaration that the March 19 vote was invalid and that all members of St. Sava were entitled to vote on reaffiliation and (2) injunctive relief against any further action by the Board toward reaffiliation. However, by the time the court heard the T.R.O. application, on May 9, 1989, the Board had already notified the Diocese by letter of the vote for reaffiliation, and the Bishop had notified the Board in turn that St. Sava was readmitted to the Diocese. The court denied the T.R.O. application.[4]

---

Constitution, the Rules and Regulations and the laws of the state or province in which the parish may be registered.

"2.   The property of the Church-School [c]ongregation consists of all that property in general, as well as property of individual funds, instituions [*sic*] and establishments acquired by the individual congregation with its material means, or by gift. Property of the Church-School congregation shall be used to serve the Church, school, religious-educational and charitable purposes of the conrgregation [*sic*]. Properties of the Church-School congregation shall be administered directly by the board thereof, under the direct control of the Diocesan council, and in accordance with this Constitution, the [R]ules and Regulations, and the laws of the state or province in which it is incorporated.

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"6.   Any church body has the right to individually administer its own property, funds and bequests and to use them in accordance with the designated terms thereof, and in accordance with this Constitution and Rules and Regulations of the Serbian Orthodox Church in the U.S.A. and Canada. . . ."

[4]In discussing the hearing on the T.R.O., plaintiffs assert that the parties agreed on April 21, the original hearing date, to continue the hearing and to take no action in the interim which would change the status quo, and that the Board and its counsel thereafter committed various acts which amounted to a bad faith breach of this agreement. Plaintiffs' assertions as to these purported acts by the Board and its counsel are offered without a single supporting reference to the record. Therefore we disregard them. (Cal. Rules of Court, rules 13, 15(a).)

In addition, plaintiffs accuse the Board of taking various steps against plaintiff Vukovich in retaliation for filing this lawsuit. Most of these accusations are likewise unsupported by

The trial court subsequently granted plaintiffs' motion for class certification, defining the class as all members of St. Sava without respect to voting or nonvoting status. A total of 75 out of the 141 members of the church opted out of the class.

The matter was tried by court trial in November 1989. In support of plaintiffs' theory that the dispute implicated property rights of St. Sava and its members, plaintiff Vukovich testified that the Diocese's requirement St. Sava conform its bylaws to those of the Diocese posed a threat to St. Sava's hitherto absolute right to control its own property. When asked why the Bishop's statements that the Diocese did not want to take over St. Sava's property had not eased his concerns, Vukovich replied: "We don't know what's gonna come down from Belgrade tomorrow. The Bishop says that we're under the rules and regulations that are established by the National Assembly and the orders that come from Belgrade. *That is my fear, of what is coming.*" (Italics added.)

In addition, plaintiffs presented in evidence a letter written by the Patriarch of the Serbian Orthodox Church in Belgrade in 1969, in which the Patriarch proclaimed that "schismatics" (i.e., supporters of the bishop defrocked in 1963 who refused to accept his removal from office as valid) would be denied the sacraments of the Orthodox faith, including the Orthodox burial service, and would not be allowed burial in any Orthodox cemetery. According to plaintiff Vukovich, this letter meant that all members of St. Sava who refused to accept reaffiliation with the Mother Church would lose their property rights to gravesites at St. Sava's cemetery. He himself, since filing this lawsuit, had been stripped of two of the four gravesites he previously owned in the cemetery.

The Board put on evidence that the Patriarch's 1969 letter had been repudiated by the Bishop of the Diocese in recent communications with the Board. They also presented testimony that plaintiff Vukovich had lost two of his four gravesites because he had not paid for them and because other church members who owned no grave sites objected to Vukovich having so many.

As to the issue of the Diocese's "control" over St. Sava and its requirement that St. Sava conform its bylaws to those of the Diocese, the Board

citation to the record. The only point as to which plaintiffs refer us to the record is Vukovich's claim that shortly after the complaint herein was filed the Board took away two of the four gravesites he formerly owned in the church cemetery. The testimony at trial on this point is discussed *post*. Here we note that since the trial court made no finding on this question of fact, it is improper for plaintiffs to present Vukovich's disputed claim of retaliation in their statement of facts as though it had been proved at trial. (See *Bones* v. *Fusco* (1937) 21 Cal.App.2d 476, 479 [69 P.2d 911].)

offered the testimony of Father Rade Wimbish, a Serbian Orthodox parish priest who serves on the board of the Diocese. He explained that the Diocese would exercise control over St. Sava only in religious matters: "Their major concern is not property or who it belongs to or who owns it. . . . [T]he major concern is that a properly ordained priest is serving the Holy Alter [*sic*] of God in the alter [*sic*] area." This was the meaning of St. Sava's reaffiliation with the Diocese. The Diocese's control over St. Sava's property would be exerted only to ensure that the property was used according to Orthodox tenets (e.g., that parties or dances would not be held on the property during fasting periods, and that the parish church would not be converted to a secular use). Ownership of St. Sava's property would pass to the Diocese only if the parish voted to disband and turn the property over to the Diocese, or if the parish totally abandoned the property. If St. Sava failed to conform its bylaws to those of the Diocese, the only consequence would be the removal of its priest and the disaffiliation of the church from the Diocese.

At the conclusion of the trial, the trial court issued a tentative decision in favor of the Board, finding as follows:

"The Court intends to find that this dispute clearly involves an essentially ecclesiastical dispute and does not concern an issue of ownership or a right to possession of property. Reaffiliation with the diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs[,] even though in this case there is the future possibility of some affect [*sic*] on church property. The letter on behalf of the Bishop dated April 5, 1989, states that reaffiliation will not require the Church to turn over its property to the Diocese.

"The Court intends to find that no church property is involved at this time in this dispute.

"The Court declines to grant any relief in this action for the reason that this dispute is essentially a religious question."

Plaintiffs submitted a request for a statement of decision pursuant to Code of Civil Procedure section 632. Both parties submitted proposals as to the content of the statement of decision. The trial court declined to adopt either proposal, instead adopting the tentative decision as its statement of decision.

## DISCUSSION

Plaintiffs assert the trial court erred by ruling it had no jurisdiction to consider their claims. They also complain that the trial court's statement of

decision was inadequate because it failed to address the dispositive issues. Finally, they ask us to decide whether the Board violated St. Sava's bylaws by failing to give proper notice of the March 19 meeting and by refusing at that meeting to count the votes of all church members.

■ We shall conclude that the trial court was correct in concluding it had no jurisdiction to adjudicate the merits of a religious dispute which did not involve any present issues of ownership or control of church property. ■ We shall conclude further that the trial court's statement of decision fully explained the reasoning underlying its decision and did not need to discuss issues unnecessary to the decision. Agreeing with the trial court that this dispute is not the kind in which civil courts may properly intervene, we reject plaintiffs' invitation to construe St. Sava's bylaws.

I

■ The United States Supreme Court has drawn a clear line between those internal church disputes in which civil courts may intervene without transgressing against the First and Fourteenth Amendments to the United States Constitution and those in which they may not. Where an internal church dispute involves a question of ownership or control of church property which the civil courts can adjudicate by applying " 'neutral principles of law, developed for use in all property disputes,' " the civil courts may properly decide the issues in controversy. (*Jones* v. *Wolf* (1979) 443 U.S. 595, 599-605 [61 L.Ed.2d 775, 782-785, 99 S.Ct. 3020].) But where an internal church dispute turns on "the resolution . . . of controversies over religious doctrine and practice," not on a property question resolvable under "neutral principles of law," the civil courts may not adjudicate the dispute. (*Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 665 [21 L.Ed.2d 658, 665, 89 S.Ct. 601].)

■ As to religious controversies within hierarchical churches, such as the Serbian Orthodox Church, it has been settled for over a century that "whenever . . . questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679, 727 [20 L.Ed. 666, 676].) The United States Supreme Court relied on this principle in *Serbian Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d 151, 96 S.Ct. 2372] to hold that the civil courts could not properly countermand the decision by the highest authority of the Serbian Orthodox Church to defrock the bishop who presided over its American diocese, notwithstanding that this decision incidentally affected the control of diocesan property.

(426 U.S. at pp. 708-720 [49 L.Ed.2d at pp. 162-169].) The same principle is dispositive in the present controversy, the latest fruit of the 30-year-old split within the Serbian Orthodox Church in America.

■■■■■ Here, 36 members of St. Sava petitioned the Board seeking reaffiliation with the Diocese because they believed that until the church rejoined the Diocese it would be an "outlaw" church whose sacraments lacked validity. The Board met with the Bishop of the Diocese to find out whether reaffiliation would have any effect on St. Sava's ownership or control of its property; the bishop explained that it would not. The Board conveyed the bishop's reassurances to the church membership. At a meeting called to vote on the question, a majority of the voting members of the church cast their votes for reaffiliation. After the vote, realizing that some members' concerns about the future status of church property had not yet been assuaged, the Board wrote to the bishop to put specific questions to him on that subject. The Diocese reiterated the bishop's previous assurances. Finally, the Board officially notified the Diocese of the vote to reaffiliate. The Diocese, "the highest of [the] church judicatories to which the matter had been carried" (*Watson, supra*, 80 U.S. (13 Wall.) at p. 727 [20 L.Ed. at p. 676]), accepted the validity of the vote by welcoming St. Sava into its ecclesiastical embrace. The question whether St. Sava should reunite with the Mother Church is patently one of "discipline, faith, internal organization, or ecclesiastical rule, custom, or law" (*Serbian Orthodox Diocese* v. *Milivojevich, supra*, 426 U.S. at p. 713 [49 L.Ed.2d at p. 165]), and we must accept the Diocese's decision on that question as final and binding. (*Ibid.*)

Plaintiffs deny that they seek to challenge the validity of the membership's religious decision to reaffiliate or the Diocese's acceptance of that decision. They insist that they object only to the manner in which the Board interpreted church bylaws on and before March 19, 1989, so as to deprive a class of church members of their purported rights to notice and voting. However, plaintiffs miss the key point: regardless of how they characterize the gravamen of their complaint, to show that the civil courts may exercise jurisdiction in this case plaintiffs must first show that the dispute turns on a present controversy over church property which may be decided by applying "neutral principles of law." (*Jones* v. *Wolf, supra*, 443 U.S. at pp. 599-605 [61 L.Ed.2d at pp. 782-785]; *Presbyterian Church* v. *Hull Church, supra*, 393 U.S. at p. 449 [21 L.Ed.2d at p. 665]; see *Korean United Presbyterian Church* v. *Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 496-499 [281 Cal.Rptr. 396].) Plaintiffs cannot clear this jurisdictional hurdle. Nowhere in plaintiffs' opening brief do they show that there is any present controversy over the ownership or control of St. Sava's property. If there is no such controversy, we lack jurisdiction to scrutinize whether church bylaws were

properly observed as St. Sava's voting membership made the religious and ecclesiastical decision to rejoin the Mother Church. (*Serbian Orthodox Diocese* v. *Milivojevich, supra,* 426 U.S. at pp. 708-720 [49 L.Ed.2d at pp. 162-169].)

Ignoring these controlling precedents from the United States Supreme Court, plaintiffs stake their jurisdictional claim on *Providence Baptist Church* v. *Superior Court* (1952) 40 Cal.2d 55 [251 P.2d 10]. That case does not aid plaintiffs.

In *Providence Baptist* the court found it had jurisdiction to consider the question whether a church had followed its own bylaws and internal procedures in discharging a pastor: "As long as civil or property rights are involved, the courts will entertain jurisdiction of controversies in religious bodies although some ecclesiastical matters are incidentally involved. (*Rosicrucian Fellowship* v. *Rosicrucian Fellowship Non-Sectarian Church* [1952] 39 Cal.2d 121 [245 P.2d 481].) That there are civil and property rights present is apparent from the findings and judgment. *The real property of the organization and funds collected are involved. Necessarily involved in the determination of who shall be pastor is the question of who shall receive the emoluments of the office, which presents a problem involving civil and property rights.*" (40 Cal.2d at pp. 60-61, italics added.)

It is doubtful that this holding remains good law in light of *Serbian Orthodox Diocese* v. *Milivojevich, supra,* where the United States Supreme Court held the secular courts had no jurisdiction to consider the question of who should be the presiding bishop of a diocese. But even assuming the jurisdictional rule relied on in *Providence Baptist* is still valid, plaintiffs have failed to show that any "civil or property rights are involved" in the present dispute. The Board produced documentary and testimonial evidence that reaffiliation had had and would have no effect on church property. In the face of this evidence, plaintiffs offered nothing more than speculation that some property-related dispute might arise in some undefined future circumstance ("We don't know what's gonna come down from Belgrade tomorrow"), a showing far weaker than that made in *Providence Baptist.*[5]

Plaintiffs additionally rely on *Snyder* v. *Evangelical Orthodox Church* (1989) 216 Cal.App.3d 297 [264 Cal.Rptr. 640]. *Snyder* is inapposite. The

---

[5]At oral argument, plaintiffs suggested that a property dispute could be found in the assessment of $51 per year dues by the Diocese. However, since dues or tithes are commonly assessed by those in control of a church, plaintiff's theory would ipso facto convert nearly every ecclesiastical dispute into a civil dispute subject to adjudication by the courts. We do not believe the courts can be so easily led into the religious thicket. Rather, the imposition of modest dues by the Diocese does not create an issue of property rights of sufficient substantiality to convert this essentially ecclesiastical dispute into a dispute cognizable in the secular courts.

issue presented there was whether defendants, church officials who disclosed to church assemblies details of a confidential confession made to them by plaintiff, a bishop of the church, could claim immunity from tort liability as a matter of law on the ground that their conduct was "ecclesiastical in nature." The court held that the trial court was not justified in sustaining defendants' demurrer to the complaint because defendants had not sufficiently alleged therein that their acts were pursuant to any church doctrine. (*Id.* at pp. 307-310.) The fact that defendants in that case could not show as a matter of law on demurrer that the dispute therein was strictly ecclesiastical does nothing to show that the trial court here erred by making such a finding after trial.[6]

We conclude the trial court properly declined to exercise jurisdiction to decide an essentially ecclesiastical dispute.

## II

Plaintiffs contend that the trial court's statement of decision was inadequate because it did not address "each of the nine principal controverted issues at trial" despite plaintiffs' request for a statement of decision as to all those issues.[7] Plaintiffs are mistaken.

---

[6]In their reply brief plaintiffs offer the following assertions: "Regardless of Respondents [*sic*] contentions that neither property rights or [*sic*] economic status is [*sic*] involved, the evidence, documentary and through the testimony of witnesses[,] is contrary. Article 26, Subsection 2 of the Diocesan Constitution is absolutely clear in its statement that the diocese shall have ultimate control over the use and disposition of parish property." These scattergun assertions, unsupported either by citation to the record or by any explanation of how the asserted facts tend to show the existence of a *present* dispute over ownership or control of church property, utterly fail to refute the trial court's finding that no such dispute exists.

[7]Plaintiffs asked the court to explain the factual and legal bases for its decision as to the following issues:

"1. Did the proposed affiliation with the Western-American Diocese of the Serbian Orthodox Church ("Diocese"), which requires St. Sava Church to conform its By-Laws [*sic*] . . . to the Diocesan By-Laws [*sic*] . . . , and especially Articles 3, 6, 26 and 41 thereof, constitute a 'matter pertaining' to the property of St. Sava Church under St. Sava By-Law [*sic*] Article 22?

"2. Does the future possibility that affiliation with the Diocese will have some effect on the property of St. Sava Church mean that affiliation is a 'matter pertaining' to the church property under St. Sava By-Law [*sic*] Article 22?

"3. Did the proposed affiliation with the Diocese which . . . required the payment of more than $7,400.00 annually in dues to the Diocese constitute a 'matter pertaining' to the economic status of St. Sava Church under St. Sava By-Law [*sic*] Article 22?

"4. Are the declaratory relief issues raised in plaintiffs' complaint concerning interpretation by the Executive Board of the St. Sava By-Laws [*sic*] with respect to providing notice under Article 22 and allowing each and every member present at the March 19 meeting to vote ecclesiastical in nature such [*sic*] to deprive the court of subject matter jurisdiction?

"5. Did the Executive Board's March 13, 1989, letter . . . which was sent to approximately 80 persons who did not receive the February 19, 1989, notice . . . and sent to

Under Code of Civil Procedure section 632 the trial court is required to issue a statement of decision on request of any party "explaining the factual and legal basis for its decision *as to each of the principal controverted issues at trial.*" (Italics added.) However, it is for the trial court to determine what are the "principal controverted issues"—those on which the outcome of the case turns. "[T]he law is well settled that if findings are made on issues that determine the case, other issues become immaterial and a failure to make additional findings does not constitute prejudicial error [Citations]." (*Division of Labor Law Enforcement* v. *Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 278 [137 Cal.Rptr. 855].)

Here, the principal controverted issue was the court's jurisdiction to adjudicate the dispute between the parties. "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715].) Once the trial court found it lacked subject matter jurisdiction to adjudicate the dispute because that dispute was solely religious and ecclesiastical, all other issues became immaterial. The trial court not only was not required to make findings on those issues, but was not permitted to do so. The court properly refrained from offering any views on the questions plaintiffs posed in their requested statement of decision, because it could not do so without contradicting its own finding of lack of jurisdiction.

*McCurter* v. *Older* (1985) 173 Cal.App.3d 582 [219 Cal.Rptr. 104] and *Miramar Hotel Corp.* v. *Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126 [210 Cal.Rptr. 114], on which plaintiffs rely, are distinguishable. In *McCurter* the trial court failed to make a finding on an issue that was material to the court's decision. (173 Cal.App.3d at pp. 592-594.) In *Miramar* the trial court issued no statement of decision despite a request for one, but entered

approximately 24 persons who did not receive Exhibit 29 fulfill the Executive Board's notice requirements to non-voting members under St. Sava By-Law [*sic*] Article 22?

"6. Were the St. Sava By-Laws [*sic*] on the subject of status as voting and non-voting members amended by the historical custom, practice and conduct between 1978 and 1989 of allowing all persons present at any meeting to vote on any issue subject to a vote?

"7. Were the St. Sava By-Laws [*sic*] on the subject of accepting written proxies amended by the historical custom, practice and conduct of accepting written proxies submitted to a meeting at which an issue was subject to a vote?

"8. Do the 1923 Decree Enforcing Trust in and Quieting Title to Real Estate . . . , the 1942 Decree Substituting Trustees and Authorizing Conveyance . . . and St. Sava By-Law [*sic*] Article 56 establish an ownership interest in all 141 members of the St. Sava Assembly in the property of St. Sava Church?

"9. Are defendants estopped to assert the validity of the March 19 vote because they misled the members of the St. Sava Assembly both on the subject of the March 19 vote and on the effect of the March 19 vote?"

judgment on a minute order. (163 Cal.App.3d at pp. 1128-1130.) Here, by contrast, the trial court entered a statement of decision adopting its tentative decision, which fully explained the factual and legal reasoning underlying the court's dispositive finding on the issue of jurisdiction. Plaintiffs do not contend that the statement of decision failed to make the court's reasoning clear on that issue. It was not required to do more.

## III

Plaintiffs lastly contend the trial court erred in interpreting article 22 of St. Sava's bylaws by finding that nonvoting members were not entitled to notice or voting rights under that article. Plaintiffs are mistaken. The trial court did not interpret article 22, because it determined it had no jurisdiction to do so under the circumstances of this case. As explained in part I of this opinion, this determination was correct. Therefore we must also decline to interpret St. Sava's bylaws.

### DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Carr, J., concurred.